### In re MIKKELSEN FARMS, INC., Debtor.

Bankruptcy No. 686–09400–W12.

United States Bankruptcy Court, D. Oregon.

May 19, 1987.

Wilson C. Muhlheim, Hershner, Hunter, Moulton, Andrews & Neil, Eugene, Or., for debtor.

Jennifer L. Palmquist, Dunn, Carney, Allen, Higgins & Tongue, Portland, Or., for creditor.

## MEMORANDUM OPINION

POLLY S. WILHARDT, Bankruptcy Judge.

The Federal Land Bank of Spokane has objected to confirmation of the debtor-in-possession's Chapter 12 plan of reorganization. Initially the Federal Land Bank challenges the debtor-in-possession's eligibility for Chapter 12 on three theories:

1. It is not conducting a farming operation. 11 U.S.C. § 101(17)(B);

2. More than 80% of the value of its assets do not consist of assets related to a farming operation. 11 U.S.C. § 101(17)(B)(i); and

3. It does not have regular income which is sufficiently stable and regular to enable such farmer to make payments under the plan. 11 U.S.C. § 109(f) and § 101(18).

The Chapter 12 trustee, although initially filing a motion to dismiss this case for lack of eligibility, has since withdrawn his motion.

This court has carefully reviewed the four memoranda the Federal Land Bank has filed in this case. It has found no specific factual allegations nor legal argument to support its claim of lack of eligibility. At the confirmation hearing the Federal Land Bank's attorney presented no evidence to support it. She made conclusory statements this debtor-in-possession had no potential to reorganize, that it had no regular income at the time it filed its petition and that it had no intent to continue to farm.

The debtor-in-possession, through schedules filed with the court and testimony presented at the confirmation hearing, has shown:

1. At the time of filing (December 10, 1986) the debtor-in-possession had assets in the form of a parcel of farm land known as the Cox Place, harvested barley and filbert crops of a value of $40,000, a bank account of $2,000, Federal Land Bank stock worth $19,000, and farming implements worth $15,000.

2. The present shareholders of the debtor are a mother and father and three of their adult children. The parents and two of these children live next to the Cox Place, or close by on other farm land.

3. The corporation was formed to do the business of farming land owned by a partnership, Mikkelsen Properties, Ltd. The mother and father some years earlier had formed the partnership so each child could own a part of the farm. The mother and father live on a piece of real property, called the Home Place, owned by the partnership at the time of filing the petition. At that time the partnership also owned parcels called Jensen's Place and Arlene's Place. The debtor corporation had, in the past, farmed all the parcels.

4. The members of the family who had "stayed on the farm" and had, in the past, done the farming were the mother and father, one son, one daughter and her husband.

5. In March, 1985, the corporation sold some of its farm equipment to meet its obligation to the Federal Land Bank which was secured by the Cox Place. It kept some equipment. This equipment consisted of the following: an Oliver # 1463 tractor, a 1972 Chevrolet pickup, a Chevrolet canopy, a pump, gas tank, fuel tank, filbert sweeper, nutpicker, pivot irrigation system, white tractor, fret spreader and harrow, INT. TD9 tractor, Mohawk grader, Rears flail cutter, Holt trailer, Flex harrow, cultimulcher, grain drill, and # 50 flail. This equipment was owned by the debtor-in-possession on the date of filing. After the

sale it had sufficient equipment to conduct farm operations on all parcels of real estate owned by the corporation and partnership.

6. In 1985 the corporation farmed all acres on the parcels except 55 acres under pivot on the Cox Place. During crop year 1986 the corporation planted and harvested barley on a large portion of the Cox Place through the labor of the elder Mikkelsen and Nancy Allen, daughter. The corporation contracted out the cutting of the barley as it did not own a combine. Mr. Mikkelsen and Ms. Allen did the hauling and storing of the barley themselves. A third party leased 15 acres for peppermint on the Cox Place. Another third party leased the irrigated 55 acres for $4,500. On behalf of the debtor-in-possession the elder Mikkelsen and Ms. Allen also harvested 12 acres of filberts on the Cox Place.

7. As of December 10, 1986, the date the petition was filed, no farming was being done by anyone on the parcels due to the time of year. As of that date a third party had, under an oral lease, leased a large part of the acreage on the Cox Place for the 1987 crop year for wheat at $35 or $45 per acre. In addition, 55 acres under pivot on the Cox Place were leased again for 1987 to a third party for $4,500. This third party signed a lease in November with the corporation. No money for any leases has yet changed hands. During discussions leading up to the leases the lessees had discussions with both the Federal Land Bank and the corporate principals about leasing as there was uncertainty as to whether the debtor or the bank "had control" over the land in late 1986.

8. Nancy Allen's husband used to farm for the family unit but was unable to earn enough through the farming to support the Allen family so now works full time in insurance. One of the Mikkelsen brothers who had farmed in previous years for the family unit now works part time in Nevada managing a farm and returns to help at home in the fall.

9. The Jensen Place and Home Place may also be leased for crop year 1987. If they could not be leased the corporation would farm the pieces itself.

10. On the morning of the confirmation hearing Mikkelsen Properties, Ltd., deeded Arlene's Place, the Home Place and the Jensen Place to the debtor-in-possession.

As a result of the passage of the Bankruptcy Judges, U.S. Trustee's and Family Farmer Bankruptcy Act of 1986, certain amendments and additions were made to the Bankruptcy code to accomodate a new Chapter 12. All citations are to the Code as so amended.

11 U.S.C. § 109(f) states:

(f) Only a family farmer with regular annual income may be a debtor under Chapter 12 of this title.

11 U.S.C. § 109(f) (1986).

11 U.S.C. § 101(17)(B) states:

(17) "family farmer" means—

(B) corporation or partnership in which more than 50 percent of the outstanding stock or equity is held by one family, or by one family and the relatives of the members of such family, and such family or such relatives conduct the farming operation, and

(i) more than 80 percent of the value of its assets consists of assets related to the farming operation;

(ii) its aggregate debts do not exceed $1,500,000 and not less than 80 percent of its aggregate noncontingent, liquidated debts (excluding a debt for one dwelling which is owned by such corporation or partnership and which a shareholder or partner maintains as a principal residence, unless such debt arises out of a farming operation), on the date the case is filed, arise out of the farming operation owned or operated by such corporation or such partnership; and

(iii) if such corporation issues stock, such stock is not publicly traded.

11 U.S.C. § 101(17)(B) (1986).

11 U.S.C. § 101(18) states:

(18) "family farmer with regular annual income" means a family farmer whose annual income is sufficiently stable and regular to enable such family farmer to

make payments under a plan under chapter 12 of this title;

11 U.S.C. § 101(18) (1986).

 Based on the schedules filed in this case it appears that more than 80% of the value of the debtor-in-possession's assets are farm-related assets. The harder question is whether the debtor-in-possession was, in fact, conducting a farming operation. This court believes the point in time at which this question must be addressed is the date of the bankruptcy filing. That date is specifically mentioned in 11 U.S.C. § 101(17) as the point at which the amount and type of debts necessary for eligibility are to be determined. 11 U.S.C. § 101(17)(A) and (B)(ii) (1986). The structure of § 101(17) clearly anticipates the court to make a thorough examination, from several perspectives, of the eligibility of a debtor under Chapter 12. Such multiple analyses would be useless if each were not made at the same point in time. Theoretically, the debtor could, at any certain different point of time, meet each one of the eligibility tests established in § 101(17).

On the date of filing, December 10, 1986, due to the time of year, the debtor-in-possession was not tilling the soil. For crop year 1987 it had leased out the acreage it then owned. This court assumes the Federal Land Bank is claiming the debtor was not "conducting a farming operation" as it was not tilling the soil as of December 10, 1986, and, as of that date, had leased its property out for the succeeding crop year.

Prior to the passage of Chapter 12 bankruptcy courts had been called upon to determine whether a debtor was a farmer within the definition of 11 U.S.C. § 101(19) for purposes of determining whether an involuntary case could be filed against it. Some courts have held cash lease payments are not income "from a farm operation owned or operated by such person" within §§ 101(19) and (20). *Armstrong v. Corn Belt Bank*, 812 F.2d 1024 (7th Cir.1987), *aff'g in part*, 55 Bankr. 755 (C.D.Ill.1985). In making this determination the Seventh Circuit in *Armstrong* stated Congressional intent behind exempting farmers from involuntary bankruptcy was because of the cyclical and risk-ridden nature of the business. Leasing farm land for cash eliminated all elements of risk to the lessor from use of the land. Thus such leasing could not be considered part of the debtor's "farming operation" as that term is defined in § 101(20). This court believes that that finding, at least in part, reflected the court's concern that if cash lease income were found to be farm income a person could avoid a bankruptcy procedure indefinitely by simply renewing the cash lease on his land year after year. Within the context of determining eligibility for Chapter 12 the courts need not be concerned about tactics used for avoidance of the bankruptcy system.

By amendment in 1986 the term "farmer" in § 101(19) specifically excludes the term "family farmer" as defined in § 101(17). Congress established new, separate and detailed standards under § 101(17) for determining eligibility for Chapter 12. Unlike § 101(19), § 101(17) does not contain a "gross income test" for corporations.

Within § 101(17) there is reference to a "farming operation". The term "farming operation" in § 101(20) applies to the provisions of Chapter 12, as the Bankruptcy Judges, U.S. Trustee's and Family Farmer Bankruptcy Act of 1986 amended § 103(a) of the Code to provide for the applicability of Chapters 1, 3 and 5 of Title 11 to Chapter 12. But one should determine whether there is a "farming operation" within the context of § 101(17) in light of the fact that the operation of the entity for whom Chapter 12 was passed to aid might have been drastically altered just prior to filing due to the very economic stress Chapter 12 was passed to alleviate.

There appears to be little legislative history to aid the courts in determining the type of "farming operation" intended to be included within the provisions of Chapter 12. It is clear from the legislative history that Congress was extremely concerned with the economic plight of families who had lived on the farm and had an established way of life in raising crops and livestock. It had recognized the provisions of Chapter 11 and Chapter 13 simply did not

meet the needs of many farmers. H.R. 5316, 99th Cong., 2d Sess., 132 Cong.Rec. H8986, 8998 (daily ed. Oct. 2, 1986). In discussions of P.L. 99–554, Sen. Grassley, a Conference Committee member, stated "the provisions ensure that only family farmers—not tax shelters or large corporate entities—will benefit." *Id.*, 132 Cong. Rec. at S15076 (daily ed. Oct. 3, 1986). Chapter 12 allows for a partial or complete liquidation of the debtor's property. 11 U.S.C. § 1222(a)(8) (1986). This provision reflects a recognition by Congress that many family farm reorganizations, to be successful, will involve a scaling down of the farm operation. *Id.*, 132 Cong.Rec. at H8999 (daily ed. Oct. 2, 1986).

■ Keeping in mind the value judgments made by Congress which lie behind the passage of Chapter 12, I believe the approach a bankruptcy court must take in determining, for Chapter 12 eligibility purposes, whether an entity is conducting a farming operation at the time the bankruptcy petition is filed must include a review of all the facts and circumstances about that entity and its operations as of the date of filing. I believe I must consider, at a minimum, whether there is a physical presence of family members on the farm, whether the debtor owns traditional "farm assets," whether leasing land is a form of scaling down of previous farm operations, what the form of any lease arrangement is and whether the debtor entity had, as of the date of filing, permanently ceased all of its own investment of assets and labor to produce crops or livestock. I have kept in mind that the leasing of farm land, for either cash or a crop share, has been an integral part of many family farm operations throughout this country for years.

■ Under the facts before me I find the debtor was conducting farm operations within the meaning of § 101(17) and (20) on the date it filed its bankruptcy petition. The debtor, through its principals, had planted and harvested barley in crop year 1986 on its own land. It had harvested filberts in that year. At filing it owned farm machinery and farm products. Stock-

holders of the debtor live on the land. Some members of the Mikkelsen family had had to cease working for the corporation in farming. This was due, however, to the economic conditions Chapter 12 was passed to alleviate. If the economy had not driven two of the family members to seek non-farm employment more hands might have been available to provide labor on behalf of the debtor. The debtor might then have chosen to lease no acreage for 1987. The leases on the debtor's land are short term, entered into with local farmers.

The last question of eligibility I must address is whether the debtor is a family farmer with regular annual income within the meaning of § 101(18). Legislative history on this section is sparce. The House Committee on the Judiciary in its report on H.R. 2211, a predecessor to the bill ultimately passed into law, indicates Congress was concerned that the statute allow for the fact a farmer may not receive income on a weekly or monthly basis. H.R.Rep. No. 178, 99th Cong., 1st Sess. reprinted in Bankr.L.Rep. No. 152 (CCH) (June 27, 1985). It indicated the provisions of § 101(27) defining "individual with regular income" would apply to Chapter 12 but the regularity of income for farmers should be determined on an annual basis. *Id.* at 6. Although the tone of the report suggests an assumption that any income to fund the plan would be from traditional farm operations based on a seasonal production, there is no statement in the history that it *must* be. Certainly the emphasis in the language and subsequent interpretation of § 101(27) has been on the *regularity* of the income available to fund a plan. The *source* of income has been relevant only to the extent it affects its regularity.

The provisions of § 1222(b)(8) permit a Chapter 12 plan of complete liquidation. If a farm were liquidated there would be no income from farm operations to fund the plan if needed. An interpretation of § 101(18) to require annual income to be only from farm operations could, on occasion, deny a debtor the right, which it would otherwise have, to liquidate pursuant to § 1222(b)(8). This court must inter-

pret statutes, if possible, in a manner that is internally consistent. *2A Sutherland Statutory Construction* § 46.05 (4th ed. 1984 revision).

■ Specific reference to receipt of *income from farming operations* (emphasis added) is made in § 101(17). It is not made in § 101(18) or § 1222(a)(1), which are the sections which refer to the income which is to fund the plan. This court believes Congressional omission of its use in § 101(18) and § 1222(a)(1) after its use in § 101(17) was deliberate. If it had wanted to it could easily have provided the same language which appears in § 101(17) in §§ 101(18) and 1222(a)(1). Thus, I find that a family farmer who otherwise qualifies under § 101(17) may be a family farmer with regular income within the meaning of § 101(18) if it can show it will have regular annual income, from whatever source, that is sufficiently stable and regular to fund the plan.

■ The debtor-in-possession's principal, Ms. Allen, testified if the debtor-in-possession's land, which now includes several parcels, is not all rented for 1987 it will farm the land. There was evidence of specific leases entered into for crop year 1987. There was no showing the land is not either tillable by the debtor-in-possession or capable of being leased during the next five years, the length of the debtor-in-possession's proposed plan. The debtor-in-possession has annual income which is sufficiently stable and regular for payments under a Chapter 12 plan.

This court makes no finding regarding the sufficiency of amount of payments under the terms of the plan before the court at this time.

The parties agreed at confirmation that as of the date of filing the debtor-in-possession owed the Federal Land Bank $486,-985.58. This is the total of the allowed amount of the Federal Land Bank's claims against the debtor within the meaning of § 502(b). This amount is represented by two notes issued by the debtor-in-possession. In 1980 the debtor-in-possession issued a promissory note to the Federal Land Bank secured by a mortgage on the Home Place. In November, 1982 the debtor issued a promissory note to the Federal Land Bank which was secured by a mortgage on the Cox Place.

At the time the loans were made and up through the date of the filing of the bankruptcy petition on December 10, 1986, the debtor-in-possession owned the Cox Place, but the Home Place was owned by Mikkelsen Properties, Ltd., the family partnership. Mikkelsen Properties, Ltd., also owned two pieces of real property call Arlene's Place and the Jensen Place. On the date of the confirmation hearing Mikkelsen Properties, Ltd., by bargain and sale deed, transferred title to the Home Place, the Jensen Place and Arlene's Place to the debtor-in-possession.

The debtor-in-possession's second amended Chapter 12 plan proposes to treat its obligations to the Federal Land Bank as follows:

On its obligation secured by the Cox Place it intends to surrender Cox Place plus its stock in the Federal Land Bank for a specified dollar credit. Any amount due on the note which is unsecured is to be paid in full in cash over five years with interest at 10%. On its obligation which is secured by the Home Place it intends to transfer to the Federal Land Bank Arlene's Place for a specified dollar credit and make five annual cash payments with interest at 10%. Such obligation is to be paid in full. The plan has no express provision for eliminating the Federal Land Bank's lien on the Home Place. Paragraph 8 of the plan provides that

Except as provided in this plan or in the order confirming the plan, upon confirmation of this plan all of the property of the estate shall vest in the debtor(s) free and clear of any claim or interest of any creditor provided for by this plan pursuant to 11 U.S.C. § 1227.

Cox Place and Arlene's Place are contiguous parcels and although they retain separate legal descriptions, they have been farmed as a unit. On March 12, 1987, after a valuation hearing this court found the fair market value of these two parcels to-

gether as of December 10, 1986, was $417,-100. It declined because of lack of evidence, to place a separate value on each parcel. There has been no valuation hearing to place a value on the Home Place.

The Federal Land Bank objects to its treatment under the Plan for the following reasons:

1. The plan attempts to alter contract rights between the Federal Land Bank and an entity which is not the debtor-in-possession.

a. This court has no jurisdiction over non-debtors.

b. The plan proposals infringe upon the Federal Land Bank's contract rights and are in violation of its rights under the Fifth Amendment to the Constitution.

2. The value of the Federal Land Bank's security should be discounted to reflect its fees and costs and property taxes due on the property.

On March 19, 1987, the Federal Land Bank filed an amended proof of claim in the case alleging an indebtedness owing it, as of December 10, 1986, of $495,929.87 (revised downward to $486,985.58 at the confirmation hearing). It indicates thereon the consideration for the debt is "loan to debtor secured by real property." Paragraph 9 of the claim states: "No security interest is held for this claim except real and personal property as described in mortgages attached as Exhibits B, D and F and 3,988 shares of stock in the Interstate Federal Land Bank of America, successor to the Federal Land Bank of Harrisburg." Exhibits C, D, E and F are a promissory note and mortgage dated January 7, 1980, the note signed by the debtor, and the mortgage signed by Mikkelsen Properties, Ltd., and a promissory note and mortgage dated November 1, 1982, with both the note and the mortgage signed by the debtor. (Also, mistakenly attached as Exhibits A and B, and identified in paragraph 9 as a secured claim, are a promissory note and mortgage dated December 29, 1964, signed by Brockner Mikkelsen and Arlene Mikkelsen which are not relevant to these proceedings.) Number 12 on the proof of claim states the claim is filed as a secured claim.

On January 29, 1987, the debtor-in-possession's attorney, pursuant to § 501(c), filed a proof of claim on behalf of the Federal Land Bank. It alleges a claim for $115,867.13. Number 9 on the proof states: "No security interest is held for this claim except: mortgage on the 'Home Place' which is not property of the debtor or the estate." Number 11 on the claim states: "This claim is filed as an unsecured claim."

Although neither party specifically identified and addressed the core of the disagreement between them at the confirmation hearing, the primary portion of the debtor-in-possession's plan, to which the Federal Land Bank vehemently objects, is that portion which proposes to treat the Bank's claim which is secured by the Home Place as a totally unsecured claim. 100% of this unsecured claim would be satisfied, then, by a transfer in kind (Arlene's Place) plus five annual cash payments.

The issue this court must resolve is whether, based on the unusual facts of this case, the claim which the Federal Land Bank has against the estate which is secured by the Home Place is a "secured claim" within the meaning of the Bankruptcy Code. If it is, this court cannot confirm the proposed plan, as the amount of any such allowed secured claim has not been determined and the plan does not provide for treatment of any such allowed secured claim pursuant to the provisions of 11 U.S.C. § 1225(a)(5).

The parties do not dispute the Federal Land Bank is a creditor of this estate nor that it holds a claim against the debtor as that term is defined by § 101(4). Pursuant to the provisions of 11 U.S.C. § 502(b) a claim is to be allowed in an amount to be determined as of the date of the filing of the petition. The parties further agree the total amount of the Bank's allowed claim, as of the date the petition was filed is $486,985.58. (The proof of claim the debtor filed on behalf of the Federal Land Bank indicates the amount of the Bank's claim

secured by the Home Place as of the date of filing was $115,867.13.)

Section 506(a) provides that such an allowed claim is a secured claim to the extent of the value of the interest of the estate in the collateral and the value of the interest of the creditor in the estate's interest. To the extent the value as determined is less than the amount of the allowed claim, the claim will be treated as unsecured.

If the bankruptcy estate has no interest in the collateral then the value of the interest of the estate in the collateral is zero and secured claim status cannot be based on that collateral.

As of December 10, 1986, the debtor-in-possession did not own the collateral (the Home Place) securing one of the Bank's allowed claims. At first glance, then, it would appear that the Federal Land Bank's claim secured by the Home Place is not a "secured claim" within the meaning of § 506(a), as on filing the debtor-in-possession had no interest in the collateral; the debtor-in-possession then had appropriately treated that claim as fully unsecured in its proposed plan. In the Chapter 11 case of *In re Mazama Timber Products, Inc.*, No. 683–07505 (D.Or. Jan. 7, 1985), this court recognized the method in which § 506(a) functions to limit valuation, for purposes of that section, to property in which the estate has an interest. *Mazama*, No. 683–07505, W11, slip op. at 14 (D.Or. Jan. 7, 1985). In *Mazama* the debtor-in-possession's obligation was secured by both assets owned by the debtor-in-possession and assets owned by third party entities. I found at that time that only values of property which would be included within 11 U.S.C. § 541 constitute the value of the creditor's secured claim for purposes of both § 506(a) and § 362(d). *Mazama*, No. 683–07505–W11, slip op. at 15 (D.Or. Jan. 7, 1985). As, in *Mazama*, the assets of the third parties were never assets of the debtor-in-possession's bankruptcy estate under any part of § 541, their value could not be included in the determinations required by § 506(a).

There are some crucial differences between the facts in *Mazama* and the facts in this case, however, which have made this court pause and analyze the potential impact of the provisions of § 506(a) again. First, Chapter 12 has a section identical to Chapter 13 but not found in Chapter 11. *See*, 11 U.S.C. § 1207; 11 U.S.C. § 1306. That section is § 1207 which states:

(a) Property of the estate includes, in addition to the property specified in section 541 of this title—

(1) all property of the kind specified in such section that the debtor acquires after the commencement of the case but before the case is closed, dismissed or converted to a case under chapter 7 of this title, whichever occurs first; and

(2) earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7 of this title, whichever occurs first.

(b) Except as provided in section 1204, a confirmed plan, or an order confirming a plan, the debtor shall remain in possession of all property of the estate.

11 U.S.C. § 1207 (1986).

The provisions of § 1207 dictate that the real property, ownership of which was transferred to the debtor-in-possession on April 10, 1987, the date of the confirmation hearing, became property of the estate. As the estate now has an interest in the real property transferred, which real property includes the Home Place, the provisions of § 506(a) seem to require that the allowed claim secured by the Home Place be treated under any plan as a secured claim to the extent of the value of the Bank's interest in the estate's interest in the property. If the amount of a creditor's secured claim must be fixed, however, by valuation as of the date a bankruptcy petition is filed, then, although the Home Place, post-petition, became property in which the estate has an interest, the allowed claim secured by that collateral would be treated as unsecured as, *at the petition date*, the estate had no interest in the Home Place.

There has been disagreement among courts and practitioners as to what an appropriate point of time might be at which to determine the value of a secured claim in connection with certain activities within a case. There is general agreement, however, that the amount of the secured claim will vary at different stages of the case, depending on the purpose for which the valuation is made.

In *Mazama* this court stated: "The point in time at which the value of a claim is to be determined is the date the bankruptcy petition is filed." *Mazama*, No. 683–07505–W11, slip op. at 15 (D.Or. Jan. 7, 1985). It also cited *In re Tanner*, 14 B.R. 933 (Bankr.W.D.Pa.1981), in support of its statement that "the scheme of § 506 is that creditors will receive as a secured claim property of a value as that which they would receive through a non-bankruptcy sale of non-exempt assets as of the petition date. Thus, the Bank's interest in property to be protected within the meaning of § 362(d) is unaffected by any post-petition appreciation in the value of the creditor's security." *Mazama*, No. 683–07505–W11, slip op. at 16–17 (D.Or. Jan. 7, 1985). The *Mazama* opinion was written in response to a motion for relief from automatic stay by an undersecured creditor which had entered into an adequate protection agreement with the debtor immediately after the bankruptcy case was filed. It was written in light of the requirements of *In re American Mariner Industries, Inc.*, 734 F.2d 426 (9th Cir.1984). *American Mariner* holds that, with regard to undersecured creditors, one of the interests which must be adequately protected is the delay to the creditor in obtaining an investment return on the value of its collateral. It appears to this court that that delay would be the result of the application of the automatic stay on property of the estate if, as in *Mazama* and *American Mariner* the creditor, post filing, almost immediately requested relief from the stay. In *Mazama*,

as in most cases, the automatic stay affected the collateral in question at the instant the bankruptcy petition was filed. Thus, under these circumstances, an undersecured creditor's interest in property to be protected would need to be valued as of the date the bankruptcy petition was filed for purposes of § 362(d).

I believe my comments in *Mazama*, within the context of the facts of that case, are correct.[1] I do not believe they are always applicable. I believe it is incumbent upon the court in each case to reexamine the application of the scheme of § 506(a) in light of the facts of the case and the *purpose* of the valuation of the creditor's interest in the property.

It is probable that the value of property securing a claim will change during the pendency of a case. Thus, the amount of the creditor's secured claim at the end of a case will be different than at the beginning. Congress recognized this fact and provided for adequate protection of a creditor's interest from the date the automatic stay becomes effective to the date the interests of the secured creditors are finally determined through, for example, the provisions of a confirmed plan.

■ A determination of the allowed amount of a secured claim for purposes of applying the provisions of § 1129(b)(2)(A)(i), § 1325(a)(5)(B) and, now, § 1225(a)(5)(B), should be as of the effective date of the plan. *See, In re Cook*, 38 B.R. 870, 872 (Bankr.D.Utah 1984); *In re Fulcher*, 15 B.R. 446, 448 (Bankr.D.Kan. 1981); *3 Collier on Bankruptcy* § 506.05 (15th ed. 1986). This approach follows the Code scheme of placing on the creditor the burden of obtaining adequate protection of its interest pending confirmation, as it eliminates the possibility that the debtor be required, under the guise of § 1129(b)(2)(A)(i), § 1325(a)(5)(B) or § 1225(a)(5)(B), in fact, to provide for ade-

---

1. The Conference Report on the 1986 Act suggests the *American Mariner* holding would not apply to a motion for relief from stay in the context of a Chapter 12 case. H.R. 5316, 99th Cong., 2d Sess., 132 Cong. at H8999 (daily ed. Oct. 2, 1986). The language of § 1205 indicates that adequate protection is to be provided to protect only the decrease in value of the creditor's collateral. 11 U.S.C. § 1205 (1986). One recent bankruptcy case has so held. *In re Rennich*, 70 B.R. 69, 15 B.C.D. 554 (Bankr.D.S.D. 1987).

quate protection of an interest established as of the date the stay became effective.

A valuation hearing towards the end of the reorganization process for purposes of determining the allowed secured claim within the meaning of these three Code sections would accomodate property which was collateral for a claim and which became property of the estate after the bankruptcy petition was filed. It also accommodates property in which the debtor might not have held any legal or equitable interest at the time the bankruptcy petition was filed and which property the trustee later recovers for the benefit of the estate. Claims of estate creditors who hold encumbrances against such property, which is treated as property of the estate pursuant to the provisions of § 541(a)(3), will be recognized as secured to the extent of the value of the property securing the claim although that value might not have been determinable on the date the debtor filed his bankruptcy petition.

Property of the estate, as defined by § 541, § 1306 and now § 1207, is affected by the provisions of § 362 establishing the automatic stay. It has been determined, in Oregon, that that effect continues, within the context of Chapter 13, until confirmation of a plan. After confirmation title to all property of the estate vests in the debtor and the estate ceases to exist. *In re Mason*, 51 B.R. 548 (D.Or.1985), *aff'g*, 45 B.R. 498 (Bankr.D.Or.1984). As the provisions of §§ 1207 and 1227 are almost identical to the provisions of Chapter 13 (§§ 1307 and 1327) whose effect was interpreted by *Mason*, this court believes the holding in *Mason* also applies to Chapter 12 cases. It is illogical to find that Chapter 12 estate creditors who hold collateral which is part of the estate and who are stayed from acts to protect their collateral prior to confirmation do not have, on the other hand, an allowed secured claim of at least the value of the collateral, giving them standing to protect their interests under the provisions of §§ 362(d), 363(e) and 364(d)(1)(B).

In paragraph 8 of its plan [2] the debtor-in-possession has included language reflecting the provisions of § 1227(c) which states:

(c) Except as provided in section 1228(a) of this title and except as otherwise provided in the plan or in the order confirming the plan, the property vesting in the debtor under subsection (b) of this section is free and clear of any claim or interest of any creditor provided for by the plan.

11 U.S.C. § 1227(c) (1986).

The language of § 1227 is identical to that of § 1327 (with the exception of the added clause "[E]xcept as provided in 1228(a) of this title" which is not relevant to this analysis. There has been disagreement as to whether the term "claim or interest" within § 1327(c) includes a secured party's lien. *5 Collier on Bankruptcy* § 1327.01 (15th ed. 1986).

Paragraph 2 of the plan states in part: "Secured creditors shall retain their liens until their allowed, secured claims have been paid." This pre-existing form language is present to eliminate any question that might otherwise arise regarding the effect, upon confirmation, of the provisions of §§ 1227(c) and 1327(c) on a secured creditor's lien.

The Federal Land Bank, however, as to the obligation secured by the Home Place, has not been treated, under the debtor-in-possession's plan, as a secured creditor with an allowed secured claim. Thus, the language appearing in the plan in paragraph 2 would not protect the Federal Land Bank from the potential effects on its lien on the Home Place of the language of § 1227(c) and plan paragraph 8.

■ For the reasons stated I find I cannot confirm the debtor-in-possession's plan. The Federal Land Bank's claim secured by the Home Place, is an allowed secured claim at least to the extent of the value of the collateral. Such claim should be pro-

---

the necessary information. Paragraph 8 is part of the pre-existing form language.

vided for under the provisions of § 1225(a)(5).

On the assumption the debtor-in-possession, through an amended plan, intends to retain the Home Place this court will address other issues which the creditor has already raised in prior hearings in this case.

The debtor-in-possession anticipates transferring other property in kind in partial satisfaction of the Federal Land Bank's claim secured by the Home Place. There is no language in either Chapter 12 or Chapter 13 which directly addresses transfers in kind of other property in payment to secured creditors. The language of §§ 1322(b)(8) and 1222(b)(7) seems to encompass such transfers. Section 1322(b)(8) states:

> (b) Subject to subsections (a) and (c) of this section, the plan may—

> (8) provide for the payment of all or part of a claim against the debtor from property of the estate or property of the debtor ...

11 U.S.C. 1322(b)(8).

11 U.S.C. 1222(b)(7) states:

> (b) Subject to subsections (a) and (c) of this section the plan may—

> (7) provide for the payment of all or part of a claim against the debtor *from property of the estate or property of the debtor* ... (Emphasis added)

11 U.S.C. 1222(b)(7).

The language of § 1225(a)(5)(B)(ii), which is identical to the language of § 1325(a)(5)(B)(ii), and which deals with the treatment of allowed secured claims where the debtor-in-possession does not surrender the collateral to the creditor, states:

> (a) Except as provided in subsection (b), the court shall confirm a plan if—

> (5) with respect to each allowed secured claim provided for by the plan—

> (B)(ii) the value, as of the effective date of the plan, *of property to be distributed by the trustee or the debtor under the plan* (emphasis added) on

account of such claim is not less than the allowed amount of such claim ...

11 U.S.C. § 1225(a)(5)(B)(ii) (1986).

Legislative history indicates, as to Chapter 13, there was an intent, within the context of this statute, to allow transfers in kind in payment. 124 Cong.Rec. H11 (daily ed. Sept. 28, 1978).

On the other hand equivalent Chapter 11 provisions addressing payments on secured claims where the collateral is not surrendered refer only to "deferred cash payments." [3] 11 U.S.C. 1129(b)(2)(A)(i)(II).

■ This court believes a transfer in kind in payment of an allowed secured claim treated under § 1225(a)(5)(B) is permissible. A property value for the transferred item, for purposes of credit under § 1225(a)(5)(B)(ii), would have to be established by consent of the parties or by the court. In Oregon a valuation hearing for this purpose will be held before the confirmation hearing.

In determining the amount of an allowed secured claim encumbrances on collateral which have priority to the creditor's lien must be deducted from the value of the collateral.

Pursuant to § 506(b), a secured creditor may not obtain payment through the bankruptcy of interest, fees and costs unless the value of the collateral is sufficient to secure those amounts. However, the second sentence to § 506(a) recognizes that the value of the collateral may vary depending on the purpose of the valuation and the proposed use or disposition of the collateral.

It is unclear whether the Federal Land Bank herein is arguing that the allowed amount of its secured claims should include its fees and costs pursuant to the provisions of § 506(b) or that the process of valuation of its collateral, pursuant to § 506(a), should take into consideration its fees and costs of foreclosure. As its collateral, the Home Place, has yet to be valued by the court it is not possible presently to determine whether the Federal Land Bank's claim secured by the Home Place

---

**3.** It can be argued 11 U.S.C. 1129(b)(2)(A)(iii) may allow transfers in kind.

may include interest fees and costs under § 506(b). The debtor-in-possession's present plan indicates it intends to retain the Home Place. In *In re Courtright*, 57 B.R. 495 (Bankr.D.Or.1986), the court determined the appropriate value for the collateral under those circumstances, pursuant to the second paragraph of § 506(a), is the fair market value, as defined therein, without reduction for fees and costs of foreclosure.

This court notes that the debtor-in-possession's plan treats disposition of the Cox Place under § 1225(a)(5)(C), not (B). With regard to that parcel, it is not appropriate to place a value on the Cox Place under paragraph 4 of the debtor-in-possession's plan. The court may find the provisions of § 1225(a)(5) have been met by the surrender of that parcel. The amount of the Federal Land Bank's allowed unsecured claim if any, arising out of the disposition of the Cox Place will only be determined if and when the Federal Land Bank files an amended claim as an unsecured creditor for any deficiency. *In re Stockwell*, 33 B.R. 303 (Bankr.D.Or.1983). (interpretation of identical language within context of Chapter 13).

The Chapter 12 trustee, Thomas Marks, has requested a trustee's commission based on the value of the property proposed by the debtor-in-possession to be transferred in kind (Arlene's Place), as well as the annual cash payments provided for by the plan. (The trustee has not requested a commission on the value of the Cox Place which the debtor-in-possession is surrendering.) The debtor-in-possession has opposed this. Paragraph 16 of its plan states:

The Trustee shall be paid a commission upon cash paid to him and distributed by him to creditors. The commission shall be in such amount as the court determines is reasonable and appropriate. No commission shall be paid to the Trustee for distributions of property under paragraphs 4. and 10. of this Plan.

Section 1202(d)(1)(B) states:

(d)(1) A court that has appointed an individual under subsection (a) of this section to serve as standing trustee in cases under this chapter shall set for such individual—

(B) a percentage fee not to exceed the sum of—

(i) not to exceed ten percent of the payments made under the plan of such debtor, with respect to payments in an aggregate amount not to exceed $450,000; and

(ii) three percent of payments made under the plan of such debtor, with respect to payments made after the aggregate amount of payments made under the plan exceeds $450,000;

based on such maximum annual compensation and the actual, necessary expenses incurred by such individual as standing trustee.

By General Order dated November 21, 1986, Chief Judge Hess appointed Mr. Marks standing Chapter 12 trustee for Oregon and established his compensation. Such order states:

IT IS FURTHER ORDERED that the trustee's maximum compensation shall not exceed the lowest annual rate of basic pay in effect for grade GS–16 of the General Schedule prescribed under section 5332 of title 5. The percentage fee for said trustee shall be 10% of the payments made under the plan of a debtor, with respect to payments in an aggregate amount not to exceed $450,000 and 3% of payments made under the plan of a debtor, with respect to payments made under the plan which exceed $450,000.

■ The issue before the court is whether transfers in kind should be treated as "payments made under the plan" within the meaning of § 1202(d)(1)(B). Under § 1202 a Chapter 12 trustee is charged with significant duties. In fact the amount of work actually required of the trustee will depend on the facts and circumstances of each case. The trustee should be paid a fee commensurate with the duties he has performed pre-confirmation and will be required to perform under the particular con-

firmed plan. However, the debtor-in-possession should not be required to pay a fee to the trustee simply because the statute requires the appointment of a trustee and one is in place. If the trustee is required to perform services to facilitate a transfer in kind of property under a Chapter 12 plan he should be paid the reasonable value of those services. If he plays no role in the transfer this court sees no reason why he should receive a fee based on the value of the property transferred.

In this case the transfer of the Arlene's Place does not require the trustee's services. At this time it appears an appropriate fee to Mr. Marks in this case, upon confirmation of a plan for services rendered and to be rendered, is 10 percent of the cash payments to be made under the plan which he will supervise.

This Memorandum Opinion contains the court's findings of facts and conclusions of law and pursuant to Bankruptcy Rule 9014, which incorporates Rule 7052, they will not be separately stated.

An order consistent herewith shall be entered.

### ORDER DENYING CONFIRMATION

This matter having come before the court upon proposed confirmation of the debtor's Chapter 12 plan and the court having entered its Memorandum Opinion herein; now, therefore,

IT IS HEREBY ORDERED that confirmation of the debtor's Chapter 12 plan is hereby denied.