In re Leo PAUL and Janice Paul, Debtors.

Bankruptcy No. 87–05759.

United States Bankruptcy Court, D. North Dakota.

Feb. 23, 1988.

F.C. Rohrich, Linton, N.D., for William and Barbara Paul.

Lynn Jordheim, Bismarck, N.D., for U.S.

Phillip Armstrong, Minot, N.D., Trustee.

Ross Espeseth, Bismarck, N.D., for debtor.

A. William Lucas, Bismarck, N.D., for First Nat. Bank of Linton.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The matter before the court is to consider confirmation of the Debtors' Chapter 12 plan as filed November 20, 1987. The Debtors' Chapter 12 petition was filed on August 24, 1987, and confirmation of their plan came on for hearing on January 12, 1988. Written objections were filed by William and Barbara Paul, Farmers Homes Administration and the First National Bank of Linton (Bank). Due to agreement reached between the Debtors and FmHA, the only remaining confirmation objection yet unresolved is that of the Bank. In substance, the Bank believes the manner in which its claim is accorded treatment under the plan is violative of section 1225(a)(5) of the Code because the plan fails to recognize the full extent of its security. Subsequent to the confirmation hearing, the Bank, on January 28, 1988, filed an additional objection charging for the first time that the Debtors failed to meet the threshold qualifications for Chapter 12 relief because a substantial portion of their income will be derived from the Conservation Reserve Program and off-farm employment.

Basically the Bank's objection insofar as plan treatment is concerned is in the nature of a request to determine the nature and extent of a security interest. Generally, Bankruptcy Rule 7001 requires such actions to be postured as adversary proceedings. The court, however, believes that in order to reach the conclusions required by section 1225(a)(5) that secured claims receive value under the plan equal to the amount of the claim, the court must first determine the amount of an objecting creditor's secured claim. Thus the court will determine the extent of the Bank's secured claim within the context of confirmation. At the hearing the parties stipulated that the document attached to the Bank's objection are accurate and the court has considered those documents in reaching its decision in this case. Those documents are identified in section 2 of this opinion. The relevant facts in this case are as follows:

## FINDINGS OF FACT

The Debtors have owned and operated a farm in Emmons County, North Dakota for the past twelve years. As part of their reorganization plan they propose to enroll a portion of their farmland in the Conservation Reserve Program (CRP) for the first time and to continue in their off-farm employment in addition to raising grain. The

plan's future income and expense projection shows that, of a total income of $66,798.00, the Debtors anticipate receiving $23,000.00 from the CRP and $11,200.00 from off-farm employment. The Debtors' statement of affairs indicates that they had $54,225.00 of farming income and $14,588.00 of income from non-farm sources in 1986.

The Bank's § 1225(a)(5) objection stems from a transaction with the Debtors on April 10, 1980. On that date the Debtors received $65,130.00 from the Bank. The Bank received from the Debtors the following:

1. An Assignment of Instrument (Assignment) executed April 10, 1980, filed with the Emmons County Register of Deeds, August 19, 1980, by which the Debtors conveyed their vendor's interest in a contract for deed to the Bank.

2. Promissory Note # 6333 executed April 10, 1980, by the Debtors in the amount of $65,130.00.

3. A Mortgage Deed executed April 10, 1980, filed with the Emmons County Register of Deeds, August 19, 1980, by which the Debtors gave the Bank a mortgage interest on property within the City of Linton and the Debtors' homestead located in Emmons County, North Dakota.

By the Assignment the Debtors conveyed their vendor's interest in a February 1, 1977, contract for deed by which they sold a bar located within the City of Linton to Kenneth and Leona Fischer. The contract required the Fischers to make payments of $600.00 per month and, as of January 1, 1988, had an unpaid balance of $63,112.23. The Assignment is a present conveyance of the Debtors' vendor's interest in the contract. It does not contain any type of defeasance clause, it is unconditional and irrevocable.

The Assignment does not refer to the other documents executed on the same day. The promissory note and the mortgage deed, however, refer to each other. The promissory note states "This Note is secured by a Security Agreement dated April 10, 1980.... The Security Agreement covers the following property: RE mtg on homestead and town property." It must be noted that no security agreement or financing statement was executed in connection with the April 10, 1980, transaction. The mortgage deed states that if the Debtors pay the Bank $65,130.00 in accordance with the terms of the April 10, 1980, promissory note, the mortgage deed will be null and void. The parties agree that the value of the property covered by the mortgage deed is $43,400.00.

On April 3, 1984, the Debtors refinanced the April 10, 1980, note by executing a new note in the amount of $70,759.10. This second note, # 2523, states, "Security: I am giving a security interest in: a tract in N.E. ¼ or [sic] 7-132-76." This tract of land is the homestead land covered by the April 10, 1980, mortgage deed. Attached to the 1984 note is an addendum which states, "It is understood that we will accept the monthly payments of $600.00 from the Fischers on their contract, with the difference to be brought up to date on or before April 3, 1985." Beginning on May 14, 1984, the Bank received payments directly from the contract for deed vendees and applied them as payments on the Debtors' 1984 note. There is no indication within the documents stipulated to by the parties as to the disposition of the contract payments between the time of the execution of the Assignment in 1980 and when the Bank began applying the payments to the Debtors' 1984 note.

### CONCLUSIONS OF LAW

#### 1.

The Bank, by its post-hearing objection contends that the Debtors propose to receive more than 20% of their income from the CRP and off-farm employment, they do not qualify as a "farmer" under section 101(19) and are therefore not eligible for relief under Chapter 12.

Section 109(f) provides that "[o]nly a family farmer with regular income may be a debtor under Chapter 12." Thus, relief under Chapter 12 is not restricted to a

"farmer" as defined by section 101(19), but rather is limited to a "family farmer." *See In re Rott*, 73 B.R. 366, 371 (Bankr.D.N.D. 1987). Section 101(17)(A) defines a "family farmer" as an:

"Individual or individual and spouse *engaged in a farming operation* [who] receive from such farming operation more than 50% of such individual's or individual and spouse's gross income for the taxable year preceding the taxable year in which the case concerning such an individual or such individual and spouse was filed...." (emphasis added).

In part, section 101(17)(A) directs the court to examine the Debtor's income in the year preceding the year in which the Debtors filed their petition. The appropriate year for the case at bar is 1986. In 1986 the Debtors were not enrolled in the CRP and had $14,588.00 of non-farm income. Comparing the $14,588.00 to the Debtors' total 1986 income of $68,813.00 plainly demonstrates that the Debtors received more than 50% of their income from farming. This is not the end of the inquiry, however. Section 101(17)(A) also states, in the present tense, that a debtor must be "engaged in a farming operation." Thus the Debtors must be currently engaged in a farming operation. The question becomes whether the Debtors' operation in which roughly one-third of the income is derived from participation in the CRP constitutes a farming operation.

Section 101(20) provides that a farming operation:

Includes farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an unmanufactured state.

While this definition at first impression appears to be precise, it is, in fact, very broad due to the inclusion of the term "farming". Also the term "includes" makes the definition non-exhaustive. *See In re Armstrong*, 812 F.2d 1024, 1047 (7th Cir.1987); *Rott*, 73 B.R. at 372. The courts deciding whether an activity constitutes farming have divided into two groups. One group tests to see whether income generated from the ques-

tioned activity is subject to the risks traditionally associated with agricultural production such as inclimate weather and disease. *See, e.g., Armstrong*, 812 F.2d at 1028. The dissenting judge in *Armstrong* disagreed with the "risk" test promulgated by the majority and instead proposed that the court evaluate the factual context surrounding an activity to determine whether it is an integral part of the debtor's farming operation. *Id.* at 1031. The majority of courts to consider the question have adopted this "totality of the circumstances" test. *See In re Burke*, 81 B.R. 971 (Bankr. S.D.Iowa Dec. 2, 1987); *In re Guinnane*, 73 B.R. 129 (Bankr.Mont.1987); *In re Wolline*, 74 B.R. 208 (Bankr.E.D.Wisc.1987); *In re Welch*, 74 B.R. 401 (Bankr.S.D.Ohio 1987); *In re Mikkelsen*, 74 B.R. 280 (Bankr.D.Or.1987).

In *Rott* this court also rejected the application of a mechanical test to determine whether a questioned activity constituted a farming operation, stating:

The court does not believe that farmers forced to *partially* liquidate assets or *temporarily* rent out machinery or farmland, in an effort to salvage their farm operation, should be foreclosed from seeking relief under Chapter 12, if such actions caused the 50% farm income test not to be met. Clearly Congress did not intend that farmers who make sound business decisions pre-bankruptcy in an effort to remedy their financial woes would be excluded from Chapter 12 relief when their immediate intention is to reorganize by actual farming. While an empirical formula for determining Chapter 12 eligibility would be convenient and desirable, this court's beliefs are in line with the dissenting opinion in the Seventh Circuit *Armstrong* case, that "it is appropriate for courts to try to draw realistic distinctions ... on a case-by-case basis, focusing on whether the income in question is essentially derived from a farming operation that is owned or operated by the recipient of the income and that reflects the traditional farming risks of cyclical and unpredictable income." (citation omitted).

*Id.* at 373. Essentially this court believes that farmers who, on a long-term basis, intend to continue to farm should not be denied relief under Chapter 12 because they are forced by economic necessity into scaling down their core farming operation by moving into collateral income producing endeavors. This approach, however, will not be applied to bring debtors who have abandoned their farming operation and have no intention or returning to traditional agricultural production under the protection of Chapter 12. *See Burke,* at 976 (stating "the focus must be on the 'continuation' of farming endeavors, and not on reviving abandoned operations.").

The court in *Mikkelsen* distilled the following factors for use in determining whether a debtor's operation is a continuing farming operation: whether there is a physical presence of family members on the farm; whether the debtor owns traditional farm assets; whether leasing out land is a form of scaling down previous farm operations; what is the form of the lease; and whether the debtor ceased all of its own investment of labor and assets to produce crops or livestock. *See, Mikkelsen,* 74 B.R. at 285.

■ In the present case the Debtors have engaged in traditional agricultural production for twelve years and intend to continue living on the farmstead and raising crops. They also retain their farm machinery. Thus, the court believes the Debtors have a long-term, continuing commitment to traditional agricultural production and that the land enrolled in the CRP will one day be returned to crop production. Enrolling land in the CRP is similar to cash renting or selling part of a line of farm machinery. When accompanied by an intent to continue farming, they are all methods of scaling back operations to a size which the debtor is financially able to maintain. *See Armstrong,* 812 F.2d at 1027 (reasoning that income from machinery sale to scale down operation is farm income); *Burke,* at 977 (concluding that income from temporarily cash renting land is farm income).

Thus, the court concludes that the totality of the circumstances in this case indicate that CRP payments received by the Debtors are an integral part of their ongoing farming operation. Consequently, they qualify for relief under Chapter 12.

2.

The Debtors propose through their plan to write down the amount of the Bank's claim of $70,705.64 to the value of the property covered by the mortgage deed, $43,400.00. The Bank objects to this treatment asserting that the value of the mortgaged property, together with the value of the contract for deed payments assigned to the Bank, exceeds the amount of the Bank's claim and the Bank is therefore oversecured. The Debtors claim that the assignment was a sale. Thus, they argue that the assignment was not a security interest and the Bank is not entitled to a secured claim in an amount including the value of the assignment.

■ Section 1225(a)(5)(B)(ii) provides that a plan shall be confirmed only if:

(5) With respect to each allowed secured claim provided for by the plan—

\*   \*   \*   \*   \*   \*

(B)(ii) The value, as of the effective date of the plan, of property to be distributed by the trustee of the debtor under the plan on account of such claim is not less than the amount of such claim....

Thus, the amount which the plan must propose to pay to the Bank is the value of its secured claim. The amount of the Bank's "allowed secured claim" is determined by reference to section 506(a). Section 506(a), in relevant part, provides:

An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value such creditors' interest *in the estate's interest* in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim.

11 U.S.C. § 506(a) (emphasis added). Thus, a creditor's secured claim is limited by the amount of the value of the estate's interest in the collateral. *See* 3 Colliers on Bankruptcy ¶ 506.04 (15th ed. 1987). If the estate has no interest in specific property, a creditor does not receive a secured claim in the amount of the value of the property. *See In re Campbell*, 8 B.R. 335, 337 (Bankr.S.D.Ohio 1980). Section 541(a) provides that the property of the estate consists of "all legal or equitable interests of the debtor in property as of the commencement of the case." So in order for the estate to have an interest in property, the Debtors must have had such an interest at the time he filed his petition.

■ In the present case the Assignment executed by the Debtors in 1980 conveyed their interest in the 1977 contract for deed to the Bank. In order for an assignment to be a security interest rather than an absolute conveyance it must be subject to an express reservation by the assignor of the right to, within a specified period of time, pay off the underlying debt and have the property restored to him. *See Grimes Dry Goods Co. v. Malcolm*, 164 U.S. 483, 489, 17 S.Ct. 158, 160, 41 L.Ed. 524 (1896); *Bostrom v. Bostrom*, 60 N.D. 792, 795, 236 N.W. 732, 734 (1931); *Padzensky v. Kinzenbaw*, 343 N.W.2d 467, 471 (Iowa 1984). Since the Debtors' assignment to the Bank in the present case did not reserve any interest of redemption in the contract for deed payments, it would appear that the Debtors conveyed away their entire interest in the contract before filing their petition. However, even when an assignment document absolutely conveys a party's interest, the court may consider evidence that the assignment was intended to be a security interest. *Padzensky*, 343 N.W.2d at 471. The court may infer the parties' intentions from their conduct and the circumstances surrounding the transaction. *Id.* In the transaction at issue in this case it is unlikely that the Debtors intended to incur a liability of $65,130.00 *and* unconditionally convey their interest in a contract for deed with something more than $63,-000.00 still owing on it, all in exchange for $65,130.00 in cash. Furthermore, the re-payment schedule accompanying the Debtors' note indicates that subsequent to May 14, 1984, the payments from the contract vendees were applied to the Debtors liability each month. Before that time, however, the repayment schedules and other documents do not indicate that the bank was receiving the payments. If the Bank had purchased the contract one would expect it to have collected the payments. Also, in 1984 the Bank agreed to begin applying the contract payments to the Debtors' liability. This action is wholly inconsistent with the conclusion that the Bank owned the contract rights and the Debtors had no right to the payments. Thus, the court concludes that the Debtors retain ownership of the right to have the bank apply contract payments to the amount of the Debtors' liability on their note.

### 3.

■ Next the Debtors argue that if the Bank did hold the assignment as security, it did not properly perfect its security interest and therefore, pursuant to section 544, they do not need to pay the Bank the value of its interest in the contract for deed. Section 41–09–04(10) (U.C.C. § 9–104(j)) provides that Article 9 does not apply to "the creation or transfer of an interest in or lien on real estate." The linchpin of the Debtors' argument is that the assignment is personalty subject to Article 9 of the U.C.C. and that the Bank neglected to obtain a security agreement which is required to create a security interest under Article 9. As support for their assertion that the assignment is not an interest in real estate, the Debtors cite this court's decision in *In re Scherbenske*, 71 B.R. 403 (Bankr.D.N.D. 1987). However, *Scherbenske* does not stand for the proposition for which the Debtors cite it. Rather, in that case the court concluded that the perfection of an I.R.S. lien was resolved by reference to federal law and did not depend upon whether a contract for deed assignment was real or personal property. The court stated,

Thus, as to the issue of attachment of the I.R.S. lien, it makes no difference whether the debtors' interest is real or

personal as far as perfection is concerned nor does it matter what the effect under state law might be in a nonfederal situation.

*Id.* at 406. Thus, in *Scherbenske* the court did not reach the issue of the nature of a contract for deed assignment.

In bankruptcy proceedings the court is to determine property rights by reference to state law. *See Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). The North Dakota Supreme Court, however, has been silent on the issue of whether a contract for deed assignment constitutes an interest in real property. In the absence of a state decision, the court turns to the United States Court of Appeals for the Eighth Circuit which has decided that such an assignment constitutes an interest in real estate. *See In re Shuster,* 784 F.2d 883, 884 (8th Cir.1986). In *Shuster* the court noted that the vendor on a contract for deed retains legal title to the land and thus, an assignment of such an interest was a transfer of an interest in real estate within the meaning of U.C.C. § 9–104(j). The court reasoned that persons tracing the title of a piece of land would not normally expect to examine records filed with the secretary of state as they would be if the assignment were subject to Article 9. Thus, this court concludes that, were the North Dakota court presented with the question, it would hold that an assignment of a vendor's interest in a contract for deed is an interest in real property. In the present case, then, the Bank was not required to comply with Article 9 to perfect its interest. Rather, the Bank perfected its assignment by filing it with the county register of deeds.

### 4.

■ The amount of the Bank's secured claim is the value of the mortgage on the Debtors' homestead, $43,400.00, plus the value of the assignment. The assignment was not valued at a valuation hearing. Nevertheless the unpaid balance on the contract as of January 1, 1988, was $63,-112.23. The court concludes that its value is at least sufficient, when added to the $43,400.00 value of the mortgage, to fully secure the Bank's $70,705.64 claim. Thus the plan does not meet the requirement of section 1225(a)(5)(B)(ii) in that the plan only proposes to pay the Bank the present value of $43,400.00.

Section 1225(a)(5)(B)(ii) mandates that the Bank receive a stream of payments equal to the present value of its claim of $70,-705.64. If one amortizes this sum over the proposed plan term of eleven years at 12% the monthly payment required would be $967.10. Requiring the Debtors to maintain this stream of payments via their plan, of course, ignores the fact that the Bank may also be receiving a $600.00 monthly payment from the contract for deed vendees in consequence of the assignment. If the Bank continues to receive the contract for deed payments concurrent with a plan payment of $967.10, it will be receiving $1,567.10 every month in consequence of an obligation having a present value of $70,705.64. A monthly payment of $1,567.10 against an obligation in this amount is reflective of a repayment term of five years at 12%. Disregarding this collateral payment source in considering the payments necessary under the plan, would mean that the Debtors, after five years, would be making monthly payments of $967.10 against an obligation that no longer even exists! Doubtless they would shortly file a motion for post-confirmation modification asking to reduce the amount of their plan payments to the Bank in recognition of payments on the claim from the collateral source. 11 U.S.C. § 1229(a)(3). This court believes that that which can be done post-confirmation ought to be available at the pre-confirmation stage also.

Clearly, the plan as presently constituted is defective in its treatment of the Bank's claim in that it fails to recognize the full amount of the claim. Additionally, if payments under the plan are regarded as the sole source of payment, then the $967.10 monthly payment results in increasing total payments to secured creditors from $36,-856.00 to $41,337.76 in the first year. The Debtors project having $39,298.00 available in the first year with which to make payments to secured creditors and if this fig-

ure is correct, it would mean a $2,039.76 shortfall in the first year of the plan, assuming a required payment of $967.10 to the Bank.

However, if payments required under the plan are computed in recognition of the collateral source payments being received by the Bank in consequence of the contract for deed assignment, then the Debtors, over the eleven year term should be paying only $367.10 per month—an amount which easily fits into their budget.

 The court believes it to be inequitable and contrary to the apparent intent of the parties to require what would essentially amount to duplicate payments against a single obligation. It believes that the stream of payments necessary under the plan in order to meet the present value requirements of section 1225(a)(5)(B)(ii) ought to be reduced by the amount of any payment received from a collateral source. So long as the Bank continues to receive payments from the Fischers in consequence of the contract for deed assignment, such payments should be applied to the Debtors' outstanding loan and concomitantly operate to reduce any payment otherwise required under the plan. The exact amount of these payments cannot be guaranteed due to the possibility of default on the part of the vendees. However, the Bank, at that point, would have the right to cancel the contract for deed, sell off the property and apply proceeds to whatever remaining indebtedness might remain on the Debtors' note. A possible solution to this uncertainty would be for the Debtors' plan to include an alternative repayment schedule in which different monthly payments would be triggered depending upon the stability of the contract for deed payments. The requirement of section 1225(a)(5)(B)(ii) would be met so long as the Debtors in understandable terms promise to maintain the present value of $70,705.64 through plan payments to the extent that the present value is not being shored-up by payments from the collateral source.

Although the court feels the treatment being accorded the First National Bank of Linton as expressed in the Debtors' plan filed November 20, 1987, does not meet confirmation requirements, it is confident for the reasons stated herein that the plan can be modified to meet confirmation standards.

Accordingly, and for the reasons stated, confirmation of the Debtors' Chapter 12 plan filed November 20, 1987, is DENIED.

SO ORDERED.