WILLIAM J. CAMPBELL, Senior District Judge.
Debtor-appellant Bernard Armstrong seeks to avoid being placed in involuntary bankruptcy pursuant to 11 U.S.C. § 303, et seq. He appeals determinations by the bankruptcy court and the district court that he is no t a farmer within the meaning of 11 U.S.C. §§ 303(a) and 101(17) and (18) and that he is a debtor within the meaning of 11 U.S.C. § 303(h)(1). For the reasons set forth below, we affirm the rulings of the lower tribunals.
On March 31, 1982, appellee, the Corn Belt Bank, now known as BancMidwest of McLean County, N.A., commenced this action by filing a petition seeking to place Armstrong in involuntary bankruptcy under Chapter 11. Undisputably, Armstrong’s primary source of income since 1939 has been derived from farming activities. Involuntary cases such as the one at bar are not permitted against a person deemed to be a farmer pursuant to 11 U.S.C. § 303(a). Section 303(a) reads:
An involuntary case may be commenced only under Chapter 7 or 11 of this title, and only against a person, except a farmer or a corporation that is not a moneyed, business, or commercial corporation, that may be a debtor under the chapter under which such case is commenced.
However, to be considered a farmer, and to be protected from involuntary Chapter 11 proceedings, one must meet the stringent criteria set forth at 11 U.S.C. § 101(17) and (18). 11 U.S.C. § 101(17) reads:
“farmer” means person that received more than 80 percent of such person’s gross income during the taxable year of such person immediately proceeding the taxable year of such person during which the case under this title concerning such person was commenced from a farming operation owned or operated by such person.
11 U.S.C. § 101(18) defines a farming operation in the following manner:
“farming operation” includes farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an unmanu-factured state.
The lower tribunals ruled that less than 81% of Armstrong’s taxable income for 1981, the relevant time period, was derived from farming. They also ruled Armstrong was a debtor within the meaning of 11 U.S.C. § 303(h)(1), infra. These two determinations subject Armstrong to involuntary Chapter 11 proceedings. In this appeal Armstrong objects to the two determinations. We first provide some perspective behind the dispute, then address the “farmer issue” (§ 101(17) and (18)) and close with the “debtor issue” (§ 303(h)(1)).
I
The parties are in agreement concerning the sources of Armstrong’s gross income for. 1981. How that income should be classified pursuant to § 101(17) and (18) is the crux of the dispute. Armstrong’s gross income for 1981 is as follows:
Sale of Beans $33,175.00
Sale of Corn 4,932.00
Sale of Machinery 29,500.00
Elevator Patronage Dividend 72.00
Farming Rent 17,181.50
Gasoline Tax Credit 61.00
Gasoline Tax Refund 92.50
*1026 Interest from Farm Account $1,701.00
Wages from Armstrong Seed Co. 12,000.00
Non-farm Interest 350.00
Non-farm Interest 28.00
TOTAL GROSS $99,093.00
First, the parties agree that income Armstrong received from the sale of beans and corn should be considered as derived from a farming operation within the meaning of § 101(17) and (18). Secondly, the bankruptcy court ruled no evidence was presented by appellee concerning the gasoline tax credit or refund or the elevator patronage dividend. Therefore, it ruled the bank failed to meet its burden of proof concerning these items and they would be considered as income from farming operations (see bankruptcy court decision of December 1, 1982, page 4). This result (or waiver) is not contested on appeal. The dollar amounts surrounding these items appear inconsequential. The parties further agree that the income received from wages from the Armstrong Hybrid Seed Company and the “non-farm interest” monies do not constitute income from farming operations within the meaning of § 101(17) and (18). This leaves us with three final items — income Armstrong received from the sale of farm machinery, money received from acreage Armstrong rented to a third party and interest income received from a farm account of Armstrong’s.
The lower tribunals ruled these three items do not constitute income received from farming operations within the meaning of § 101(17) and (18). Armstrong argues on appeal that all three items should be considered as derived from his farming operation. We hold the sale of the farming equipment should have been considered as received from the farming operation, reversing the ruling of the lower tribunals on this item. However, we affirm the lower courts’ ruling that the rental income and interest from the farm account was not received from the farming operation. 55 B.R. 755 (1985). Hence, after some calculating, while we differ from the lower tribunals on how the sale of the farming equipment should be treated, our affirmance on the other items means Armstrong has still failed to demonstrate that over 80% of his income was derived from farming operations. Armstrong’s plight remains the same, but the means to the end is to be altered.
II
We agree with appellant that the lower courts’ rulings on the sale of the farm machinery were simply too rigid an analysis when one takes into account the purpose and history behind the relevant statutory law and the broad interpretation to be given to the bankruptcy code in general. In the instant case Armstrong’s farm machinery was inescapably interwoven with his farming operation. Importantly, it is undisputed Armstrong was never in the business of buying, selling or trading such machinery. The machinery was purchased to work the acreage that represented Armstrong’s farming operation. Had the farm prospered, the machinery would have stayed in Armstrong’s possession. He bought the machinery so the farm could exist and prosper. But for the machinery, there would be no farm. Section 101(18) defines “farming operation” as including, “... farming, tillage of the soil, dairy farming_” The definition does not provide a simple all-inclusive list of tasks and activities (i.e., tillage of the soil, dairy farming). Instead, the section starts out in general terms — “Farming operation includes farming, tillage of the soil, dairy farming ...” (emphasis added). Implicit in this definition is the inclusion of general activities inherent in farming and, we believe, the means (or in this case the equipment) necessary to perpetuate the farming operation the definition speaks of. When a farmer sells some of his machinery in an effort to scale down his operation (say from 200-100 acres) and save the farm, the money received is inescapably from the 50% of the farming operation dissolved.
We believe this to be a pragmatic viewpoint. A contrary result would reap illogical results which we are confident Congress had no desire to create. Farmers in financial trouble could harvest their crop on a given year, decide to scale down their operation, sell machinery and be considered *1027 non-farmers under § 101(17) even though they had no significant outside employment or income. Suppose Armstrong had no income from farming rent or the seed company. After all, many legitimate farmers do not rent land or receive wages from outside companies. Given this scenario Armstrong could have made money solely from the sale of beans and corn (and inconsequential income from elsewhere) and yet still have been considered a non-farmer. This result is illogical, undesired and unnecessary. One envisions large numbers of cases where farmers, by merely pruning their operations and selling their equipment, are no longer considered farmers for purposes of the bankruptcy code. We do not believe Congress envisioned such a scenario and believe a broader interpretation is necessary.
Farmers are exempted from the commencement of involuntary cases under Title 11 “... because of the cyclical nature of their business. One drought year or one year of low prices, as a result of which a farmer is temporarily unable to pay his creditors, should not subject him to involuntary bankruptcy.” See Senate Report No. 95-989, U.S.Code Cong. & Admin.News 1978, p. 5787 as found in the Historical & Revision Notes of Title 11. This rationale is steeped in the concept of risk; farmers are caught in a risk-ridden enterprise. To say that the implements which are necessary to perpetuate the enterprise are not part of the enterprise is not logical, especially when, as in the instant case, the implements are sold to keep the enterprise, in its failed form, afloat. We may have reached a different result if the record had revealed that Armstrong had a history of buying and selling equipment on an experimental basis or for investment purposes. However, the record in this case inescapably points to the fact that the sale in this case was, “... a sale of a portion of the equipment of a person in financial trouble.” See Bankruptcy Court Opinion and Order of December 1, 1982, page 4. The record reveals the equipment was a necessity for the farming operation, not a detached investment distinct from the farm. Hence, we conclude it was part of Armstrong’s “farming” within the meaning of the definition of “farming operation” found at § ioris).[1]
Ill
We reach a different conclusion concerning Armstrong’s request that we include his rental income from rented farm land for purposes of § 101(17) and (18). In 1981 Armstrong rented acreage to a man named Hanlon. The bankruptcy court found Armstrong received the rent money from Hanlon in cash and up front. This is not a risk-laden venture in the nature of farming. It cannot be considered part of Armstrong’s personal farming operation. Armstrong argues he actively participated in the tillage of the crops on Hanlon’s acreage and provided fertilizer for that acreage. However, he admits he was not required to do so under the written lease arrangement with Hanlon. His help to Hanlon served to keep an eye on Hanlon, 1981 being the first year of what could more accurately be described as a landlord-tenant relationship.
*1028 In the arrangement described above, Armstrong is not exposed to “... the irregular nature and the potential ups and downs ...” which “... would require a different test for an involuntary petition against a farmer ...” See H.R. Doc. No. 93-137, 93d Cong., 1st Sess., pt. I at 224 (1973). Armstrong cites In re Blanton Smith Corp., 7 B.R. 410 (Bkrtcy.1980) for the proposition that § 101(18)’s definition of “farming operation” should be given a broad interpretation. As stated earlier, we agree with this proposition, although our holding against Armstrong here does not contradict the ruling of Blanton Smith. In Blanton Smith the primary issue was whether an agribusiness or farming corporation could be considered a “farmer” pursuant to § 101(17). The debtor was involved in the processing, packaging and marketing of eggs. The laying birds were owned by the debtor but were cared for by separate farmers (including a wholly-owned subsidiary of debtor) on approximately 30-40 farms in the surrounding area. The debtor in Blanton Smith provided the food, supplies and medication for the birds. It then collected and marketed the eggs from the independent farmers. The bankruptcy court ruled that while the debtor was not “an individual personally engaged” in the farming operation (under § 1(17) of the Bankruptcy Act of 1898) it was a farmer nonetheless.
In Blanton Smith, the debtor was exposed to the inherent risks of raising laying birds and producing eggs. The debtor owned the birds and provided food and medication. If, for example, a disease hit the area and all the birds became sick or died, the debtor’s fortunes would have been tied to these unavoidable risks. In contrast, in the case at bar, Armstrong received cash up front from his rental arrangement with Hanlon. Had disease or bad weather ravaged Hanlon’s crops, Armstrong would have had his rent money regardless. There was no risk involved. Armstrong was insulated from the traditional risks of farming. In Blanton Smith, the debtor’s income was tied to his personal efforts; in the case at bar the lease or rental arrangement removed the risk. See H.R. Doc. No. 93-137, 93d Cong., 1st Sess., pt. II at 74 (1973). Any efforts by Armstrong to help Hanlon were to protect this risk-free rent arrangement with Hanlon, perhaps with an eye to the next planting season. Surely, such an arrangement was not within the meaning of § 101(18).[2]
*1029 To summarize: we conclude for reasons set forth above that Armstrong’s income from the seed company’s wages and from the rental of farming acreage is to be considered non-farm income for purposes of 11 U.S.C. § 101(17) and (18). Hence, Armstrong’s 1981 gross income is less than 80% farming-derived and, pursuant to § 101(17), Armstrong is not entitled to the farmer’s exemption found at § 303(a). The affirmance of the lower tribunals on these two items means the result of their rulings remains the same. However, since we rule the sale of the farming equipment should be considered as derived from the farming operation within § 101(18), the means to the end has changed.[3]
IV
With the above ruling in mind, the remaining issue is whether Armstrong can be considered a debtor within the meaning of 11 U.S.C. § 303(h)(1). 11 U.S.C. § 303(h)(1) reads in pertinent part:
"... the court shall order relief against the debtor in an involuntary case under the chapter under which the petition is filed ... only if—
(1) the debtor is generally not paying such debtor’s debts as such debts become due unless such debts that are the subject of a bona fide dispute; ...”
We agree with the lower tribunals that Armstrong can be considered a debtor. It is clear that Armstrong owes appellee $493,000, as evidenced by over a half dozen notes signed by Armstrong individually. Armstrong does not really dispute this. Instead, he argues the district court incorrectly added to this debt a $450,000 loan to the Armstrong Hybrid Seed Company. Armstrong argues the seed company debt was contingent as to liability on the first debt. He further asserts it was never established that he was in default on the seed company loan.
First, we find no persuasive rebuttal by Armstrong to the decision of the lower tribunals that the seed company debt is not contingent as to liability on the first debt of $493,000. Arguably, this first debt is in itself sufficient to declare Armstrong a debtor pursuant to § 303(h)(1), but we need not reach that determination. The record reveals Armstrong personally guaranteed $450,000 of the $453,911.62 loan to the seed company. This personal guaranty placed Armstrong in the position of an original promisor, immediately personally liable upon default of the seed company loan. No contingency status attaches. See, for example, Illinois Law & Practice, Vol. 20, Guaranty, Section 44, page 541. Further, while Armstrong argues it was never proven he was in default on the seed company loans, even he admits the bank received only “some” payments (see Armstrong brief, p. 18). This statement, weighed with the undisputed evidence that Armstrong was behind on his payments on the original $493,000 loan, leads to the reasonable conclusion of the lower tribunals that Armstrong was failing to meet his payments on almost $1,000,000 worth of debts. Further, the bankruptcy court found Armstrong had only approximately 100 acres of land in his name at the time of the filing of this case. Having failed to keep current on the first $493,000 loan and having merely made — at *1030 best — “some” payments on the seed company loan, we find ample support for the determination made by the lower tribunals that Armstrong should be considered a debtor within the meaning of § 303(h)(1).
As a caveat, we feel compelled to note that on October 27,1986 the President signed into law an amendment to Title 11 of the United States Code which creates two new categories in the definition section of § 101 entitled “family farmer” and “family farmer with regular annual income.” Also created is a new chapter within Title 11, Chapter 12, which sets forth a reorganization plan for the “family farmer with regular annual income.” This law is not applicable to the instant case because Armstrong cannot be classified under either definition. “Family farmer” is defined as
“(A) individual or individual and spouse engaged in a farming operation whose aggregate debts do not exceed $1,500,000 and not less than 80 percent of whose aggregate noncontingent, liquidated debts (excluding a debt for the principal residence of such individual or such individual and spouse unless such debt arises out of a farming operation), on the date the case is filed, arise out of a farming operation owned or operated by such individual or such individual and spouse, and such individual or such individual and spouse receive from such farming operation more than 50 percent of such individual’s or such individual and spouse’s gross income for the taxable year in which the case concerning such individual or such individual and spouse was filed; or ...”
“Family farmer with regular annual income” is defined as a
“... family farmer whose annual income is sufficiently stable and regular to enable such family farmer to make payments under a plan under chapter 12 of this title.”
Armstrong cannot be considered a family farmer under the new law because his $450,000 debt arising from the seed company cannot be said to arise out of a farming operation within the meaning of § 101(18). The loan to the seed company was more in the form of venture capital than a loan to a farmer to be put into a farming operation (Armstrong admits wages he received from the company was non-farm income). Hence, considering the $450,000 outstanding loan to the seed company does not arise out of a farming operation, Armstrong fails to meet the criteria set forth in the new law. Almost 50% of his noncontin-gent, liquidated debt arises from outside of the farming operation. Therefore, the new amendments to Title 11, while helpful to many other farmers, are unhelpful to Armstrong.
It Is So Ordered.

. This reasoning represents a logical extension of the reasoning found in cases such as Middleton v. Farmers State Bank of Fosston, 45 B.R. 744 (Bkrtcy.1985) where the court ruled § 522(f)(2)(B) exemptions were to be read broadly enough to include farming equipment as “tools of the trade” under that section:
This Court agrees with the District Court’s broad reading of § 522(f)(2)(B).... Farmers are forced to use large expensive implements to be farmers. Modern day farming requires large capital investments to purchase the implements necessary for farming. They should not be penalized by a closing off of their rights to exemptions simply because they choose farming as a means of supporting a family. Plaintiffs narrow reading of the exemption runs counter to the goals of the Bankruptcy Code, Id. at 748. (Citations omitted.)
(for related cases in this area supporting the concept that farming equipment is part of the farming operation and inescapably tools of the farming trade for purposes of a § 522(f)(2)(B) exemption, see In re La Fond, 791 F.2d 623, 627-28 (8th Cir.1986); Flick v. United States through Farmers Home Administration, 47 B.R. 440 (D.C.1985); In re Yoder, 32 B.R. 777 (Bkrtcy.1983)).

. The dissent would have the bankruptcy court try to draw "realistic distinctions” on a case by case basis "focusing on whether the income ... is essentially derived from a farming operation ... owned or operated by the recipient of the income and that reflects the traditional farming risks.” Yet Armstrong’s secural of payment "up front" certainly severs him from any "traditional farming risks.”
The dissent also states, "Presumably in the face of economic distress, Armstrong ... leased the land to effect a retrenchment in his operations ... if Armstrong can show a firm purpose to farm this acreage again ... the rental income could qualify.” Hence the dissent would have a court try to grapple with the issue of a farmer’s future intent. The results of such fact-finding would be haphazard and unfocused. Most farmers would say that their intention would be to farm the rented acreage in the future. After all, what would there be to lose? Indeed, a farmer could be sincere in saying this but be unrealistic in his estimation of his chances. Conceivably, a farmer could rent the land for a few years — each year telling the court (at yet another hearing) he was closer to solvency, closer to tilling. Of course, some farmers would inevitably be bluffing — deceiving the court while playing landlord. The dissent suggests courts look for, "... the first year of (a) lease, that the farm was financially troubled, ... participation] in actually operating the farm.” This criteria is more vague than it sounds. It arguably would issue a blank check for one year to any farmer who wants to lease instead of till — as long as he demonstrates he operated at a loss the year before and indicates an “intent” to let the lease expire.
The dissent states we should not treat a farmer’s land rental arrangements "mechanically.” Yet, importantly, - the opinion limits itself to "payment up front” arrangements which destroy the traditional inherent farming risks envisioned by Congress. Finally, the reason why the sale of Armstrong’s farm machinery should not be compared to his rental of the farm land is because the machinery can only be sold once (and to the detriment of any acreage still being tilled by the selling farmer). In contrast Armstrong can rent his land over and over (even farming a year in between) and keep legal ownership over the asset.
The notion advanced by the dissent is a noble one and the need to help the plight of the poor farmer in despair is recognized by all. Yet the *1029 results of the (continuous) inquiries or hearings the dissent would like courts to conduct would be inaccurate and unwieldy. Scenarios that abuse the system are easy to concoct. At worst we would be creating an oft-abused vehicle for persons to use to avoid their obligations. Considering the legislative intent behind the relevant law, for Armstrong’s type of risk-free situation, it is best to let Congress step into Armstrong's arena before we do.

. On the issue of how the interest income from Armstrong's farm account should be treated, we note that although Armstrong states it should be treated as a farm income, he presents literally no argument in his brief to support this assertion. The bankruptcy court held the interest income was non-farm income since “The income depended upon a bank, not tillage or production.” (December 1, 1982 Op., p. 5). Since Armstrong presents no argument to convince us we should rule otherwise, we see no need to disturb the ruling of the lower tribunals. In this case, the dollar amount concerned appears inconsequential. Just as appellee failed to meet its burden in the bankruptcy court on the gasoline tax credit or refund or elevator dividend, similarly Armstrong, by presenting no argument here, has failed to meet his burden in this area as well.