**In re Kenneth C. COULSTON, Debtor.**

**Bankruptcy No. 88–09895.**

United States Bankruptcy Court, E.D. Michigan, N.D.

March 16, 1989.

Thomas J. Budzynski, Mount Clemens, Mich., for debtor.

H. Dale Cubitt, Bad Axe, Mich., for Daniel and Mary Franzel.

MEMORANDUM OPINION

ARTHUR J. SPECTOR, Bankruptcy Judge.

The debtor, Kenneth Coulston, filed for relief under Chapter 12 of the Bankruptcy Code on December 1, 1988. For a debtor to be adjudged eligible for such relief it must appear that more than 50% of the debtor's gross income for the year prior to the year in which the case is filed was derived from

a "farming operation" as defined in 11 U.S.C. § 101(20). Twenty-seven thousand dollars of the debtor's 1987 income was derived from the cash rental of 430 acres of farmland. Categorizing these monies as being either from, or not from, a farming operation will determine the debtor's eligibility for Chapter 12 relief. The question presented is whether Mr. Coulston's income from the leasing of tillable land constitutes income from a farming operation to allow him to qualify for Chapter 12 relief.

## DISCUSSION

The question of what constitutes income from a farming operation has generated a firestorm the last several years. A leading case is *In re Armstrong*, 812 F.2d 1024 (7th Cir.1987), a pre-Chapter 12 case concerning farmers' § 303(a) immunity from involuntary bankruptcy.

The majority opinion in *Armstrong* adopted a mechanistic risk analysis approach which held that income received by a debtor as cash rent for farmland is not income from a farming operation. In that case, with cash rent excluded from "farm income", too much of the debtor's income was non-farm income and so the debtor was not a "farmer" for purposes of immunity from an involuntary petition. The court stated that agreements for cash rental lack the inherent risks of farming which it felt was necessary for income to be considered "farm income". In that same opinion, though, in an apparent contradiction with its cash rental rationale, the court held that the sale of farm equipment could be considered "farm income", as such a sale could be part of a legitimate effort at retrenchment. A dissent encouraged a "totality of the circumstances" approach. *Armstrong*, 812 F.2d at 1030.[1]

Those courts which followed *Armstrong* adopted it for the straightforward proposition that *risk* is determinative of farming status. *In re McNeal*, 848 F.2d 170 (8th Cir.1988); *In re Maschhoff*, 89 B.R. 768 (Bankr.S.D.Ill.1988); *In re Dutton*, 86 B.R. 651 (Bankr.D.Colo.1988); *In re Seabloom*, 78 B.R. 543 (Bankr.C.D.Ill.1987); *In re Haschke*, 77 B.R. 223 (Bankr.D.Neb.1987).

The *Armstrong* majority opinion has been interpreted to stand for a basic proposition. The sale of machinery can be considered under a totality of the circumstances approach and may be part and parcel of an effort at retrenchment; cash rental of land necessarily cannot qualify as such a retrenchment. We do not agree with this assertion. Instead, we agree with the dissent that "[i]f *Armstrong* was forced temporarily to rent this land for the same reason he was forced to sell his machinery—presumably to salvage what he could of his financially troubled farm—then the lease proceeds may be seen as income inherently tied to the uncertainties of farming and thus derived from a farming operation." *Id.*

## WHY A "TOTALITY OF THE CIRCUMSTANCES" APPROACH IS BETTER

■ A hard and fast approach to whether income is from a farming operation would, of course, simplify a bankruptcy judge's task. However, we find ourselves in the same position as Judge Hill in the case of *In re Rott*, 73 B.R. 366, 373 (Bankr. D.N.D.1987).

After extensive deliberation, this court is unable to formulate a mechanical test for parties to use in determining gross farm income for purposes of determining eligibility for Chapter 12. The court does not believe that farmers forced to *partially* liquidate assets or *temporarily* rent out machinery or farmland, in an effort to salvage their farm operation, should be

---

1. A desire for a definitive mechanistic approach was not the only motivation for the majority in *Armstrong*. At footnote two of the opinion, 812 F.2d at 1028, the court engaged in a rather lengthy diatribe, expressing a sentiment that the dissent's "totality of the circumstances approach" would result in "haphazard and unfocused" decision making. The majority's concern, apparently, was that farmers would de-

ceive the courts, bluffing that they intended to return to farm the rented land at some later time. However, distinguishing truths from untruths is an inherent function of the courts, *see e.g. In re Sobel*, 37 B.R. 780, 784 (Bankr.E.D.N. Y.1984), and a fear that some debtors will lie to achieve relief is a disingenuous reason to establish a hard and fast rule which denies truthful debtors relief.

foreclosed from seeking relief under Chapter 12, if such actions caused the 50% farm income test not to be met. Clearly, Congress did not intend that farmers who make sound business decisions pre-bankruptcy in an effort to remedy their financial woes should be excluded from Chapter 12 relief when their immediate intention is to reorganize by actually farming. While an empirical formula for determining Chapter 12 eligibility would be convenient and desirable, this court's beliefs are in line with the dissenting opinion in the Seventh Circuit *Armstrong* case, that "it is appropriate for courts to try to draw realistic distinctions ... on a case-by-case basis focusing on whether the income in question was essentially derived from a farming operation that is owned or operated by the recipient of the income and that reflects the traditional farming risks of cyclical and unpredictable income". (Emphasis in original).

Most courts which have considered the question post-*Armstrong* have adopted a totality of the circumstances approach. *In re Paul,* 83 B.R. 709, 712 (Bankr.D.N.D. 1988).

*Paul, In re Jessen,* 82 B.R. 490 (Bankr.S. D. Iowa 1988) and *In re Burke,* 81 B.R. 971 (Bankr.S.D. Iowa 1987), set forth a variety of factors to consider when determining whether income is derived from a farming operation. *Paul* enumerated the following considerations: (1) whether the debtor's operation is a continuing one; (2) whether there is a physical presence of family members on the farm; (3) whether the debtor owns traditional farm assets; (4) whether leasing out land is a form of scaling down previous farm operations; (5) the form of the lease; (6) whether the debtor ceased all of its own investment of labor and assets to produce crops or livestock. *Burke* framed its factors in the following way: (A) whether past farming has been more than short-term or sporadic; (B) whether any cessation is temporary; (C) the reason for any cessation and leasing (specifically noting "inability to obtain operating credit" as a legitimate reason); (D) the extent of the leasehold estate compared with the

property retained by the debtor; (E) the relationship between the debtor and the tenant. (Leasing to family members implies continued farming especially where the debtor is a partnership or corporation.)

The purpose of Chapter 12 is to allow a class of debtors in an industry plagued by inherent and wide-ranging ups and downs the same chance at reorganization as small businessmen or individuals. *In re Tart,* 73 B.R. 78, 81 (Bankr.E.D.N.C.1987). To automatically reject cash rent as farm income would be to deny the debtors caught in the nadir of the business cycle at least one commercially reasonable business option: to temporarily lease out land rather than leave it idle.

Hypotheticals demonstrate that the *Armstrong* analysis runs counter to the purposes of Chapter 12, and denies worthy debtors relief. *Tart* used as an example "a hog farmer who filed for relief after his stock had been wiped out in a natural disaster and who was awaiting insurance compensation before obtaining new pigs." 73 B.R. at 81. That debtor's income in the year preceding filing might have included relatively little income from hog farming. A risk analysis mandating that rental income cannot be "farm income" would deny the debtor Chapter 12 relief if he leased his entire farm to another hog farmer while awaiting the insurance check. That the distressed hog farmer made a reasonable decision not to leave his farm dormant ought not cause him to be excluded from Chapter 12 relief.

Similarly, a farmer denied financing for his 1988 crop at the last minute may then plant what he can finance himself, rent out the rest of his land, and work to assure 1989 financing. Should such a farmer earn $10,000 from his harvest and $20,000 from the cash rental of the bulk of his land, the *Armstrong* analysis would deny him Chapter 12 relief in 1989. This, we feel, is wrong.

We would likely go as far as the following hypothetical. A farmer with a seriously ill child or spouse leased his entire farm in 1988 under a cash rental agreement so

that he might care for the ill family member, all the while fully intending to return to farming in 1989. If the farmer seeks Chapter 12 relief in 1989, it would be unfair to consider the 1988 cash rental income as not being from a farming operation.

What these examples demonstrate is that the question of whether debtors are involved in farming must include a larger time frame than simply the one previous year. Although we must consider solely the income from the one previous year to determine eligibility, to categorize that income a court must look both backward and forward in time. It is necessary to look back to see whether the debtor was historically involved in farming and why the leasing of the land was necessary. There may be many legitimate reasons to lease out land for one or several years such that a determination not to include the rental income as from a farming operation would prove inequitable. A court should also look forward in time to examine the debtor's intentions as to its future in farming. If a debtor has always farmed but for the one calamitous year prior to the filing of its petition for relief, and if the debtor fully intends to return to active farming and has a rational plan to accomplish this intent, it is unduly technical to read "farm income" to exclude cash rent of the temporarily unused farmland.

### STATUTORY ANALYSIS

In *In re Wagner,* 808 F.2d 542, 546 (7th Cir.1986) (another § 303(a) case), the court concluded that it is "crystal clear" that when it used the word "farmer" in § 101(17) (now § 101(19)), Congress was abandoning the former "mud on the boots" method of defining it. That approach "had led to excessive uncertainty in application and was abandoned for a mechanical approach in which "farmer" is a technical term that means someone who in the taxable year immediately preceding the filing of the involuntary petition in bankruptcy derives more than 80% of his gross income from farming." The term "family farmer" in § 101(17)(A) is also defined with a percentage of income test. The key term in both definitions is "farming operation",

which itself is defined in terms of a series of examples of activities including "farming, tillage of the soil, dairy farming," etc. § 101(20).

Defining "farming operation" in terms of "farming" is singularly circular. One must still decide whether an activity constitutes "farming". Leasing out one's tillable land to others is "farming" if the person who does it happens to be a "farmer". If the lessor is a city-slicker investor in farmland (for tax purposes, let's say), then the act of leasing is not "farming" and the rent is not "farm income". If the lessor, on the other hand, is a farmer whose own crop is destroyed, and so has only his cash rent to live on in the year prior to bankruptcy, then the leasing of the land is a part of a "farming operation" and the rent is a part of "farm income". Obviously, this gets us nowhere except back to our original formulation. To determine whether the lessor is a "farmer", we look back past the year prior to the year of the filing of the case to see if the debtor behaved historically as a farmer; we also look at the debtor's state of mind in the year prior to the bankruptcy to determine why so large a portion of its income that year was in the form of cash rent. If it was on account of some temporary circumstance and the debtor had both an honest intention and a reasonable probability of returning to "true" farming, then that, when combined with a finding that the debtor was historically involved in "true" farming, is sufficient to label the debtor a "farmer". From that finding, the rest—that the cash rent in the year prior to filing is "farm income", and therefore the debtor qualifies for Chapter 12—easily follows.

### FACTORS FOR DECIDING HOW TO CLASSIFY DEBTOR'S INCOME FROM THE RENTAL OF TILLABLE LAND

■ Mr. Coulston has farmed since 1950. He suffered financial setbacks in the early 1980s. When he could no longer obtain government assistance in 1984, he "sold" much of his farmland—approximately 560 acres—to Daniel and Mary Franzel. This sale was made with the implicit under-

standing that Coulston could buy back the land. The Franzels were, at the time, "white knights" saving the Coulston farm from bank foreclosure. Unfortunately, the relationship soured and a state court action ensued. The sale has since been deemed by the Circuit Court for Huron County to have been an equitable mortgage; therefore, Coulston still owns the 560 acres. During the pendency of this dispute, most of this parcel was leased to third parties. The Franzels were proceeding to foreclose their mortgage on the land when Coulston sought relief in this Court. It is the income from this lease to third parties that is at issue.[2]

Some 130 acres of the 560 acres were not leased to third parties. Coulston used this land to raise hay and to pasture what he thought were his cows. As a result of the aforesaid state court litigation, however, ownership of these cows has since been determined to rest with the Franzels. Also, Coulston still owns approximately 15 pieces of equipment with which to farm in 1989 as well as real property upon which to do so.[3]

■ We find that Coulston has, since 1950, participated in activities which qualify as part of a farming operation (although the cows he has most recently cared for ultimately were awarded to the Franzels, Coulston's colorable belief in his own ownership interest should be controlling here).[4] That he wishes to remain in farming is clear, particularly since he has annually reapplied for ASCS assistance. Using the *Burke–Paul* factors to consider the totality of the circumstances, the rental income is

the fruit of a legitimate strategy to retain the farm for himself for purposes of his continuing to farm it, and, so, is derived from a farming operation. As a result, his income in 1988 is predominantly derived from a farming operation, and the debtor qualifies for Chapter 12 relief.

---

**2.** The lease payments go directly to pay off Coulston's debt to the Franzels.

**3.** Mr. Coulston testified on February 14, 1989, that he owns 77 acres of land beyond that which is subject to the Franzels' equitable mortgage upon which he grows hay to feed to the cattle discussed *infra*. These 77 acres are subject to a mortgage by an entity known as SACK. He further claims a right to a return of some 320 acres which he previously conveyed to relatives. The debtor asserted that he expects to sell a 40–acre parcel out of the 320 acres to finance a Chapter 12 plan and that he already has a purchaser for it.

**4.** It is the law in this circuit, in the context of Chapter 13, that arguments and "procedures for determining initial jurisdiction cannot be allowed to dominate the proceedings themselves nor to delay them unduly." *In re Pearson*, 773 F.2d 751, 757 (6th Cir.1985). The question is solely the good faith of the debtor in preparing schedules at the time of the commencement of the case. Although *Pearson's* holding is inapplicable, its rationale applies to assist Mr. Coulston. His good faith belief that the cows belonged to him ought to bear great weight in our time frame analysis, *supra*. That he earned no money from these cows is not controlling—particularly since his efforts apparently increased the size of the herd.