**COTTONPORT BANK**

v.

**Anthony DICHIARA, Jr. and Frankie Joe Dichiara.**

**Civil Action No. 95–1942.**

United States District Court,
W.D. Louisiana,
Alexandria Division.

Jan. 12, 1996.

Stephen D. Wheelis, Provosty Sadler & Delaunay, Alexandria, LA, for Cottonport Bank.

Robert L. Royer, Alexandria, LA, for Anthony Dichiara, Jr., Frankie Jo Dichiara.

H.A. Boughton, Chapter 12 Trustee, Jonesville, LA, pro se.

LITTLE, District Judge.

This bankruptcy appeal presents issues of first impression in this circuit regarding a debtor's eligibility for relief under chapter 12 of the United States Bankruptcy Code, 11 U.S.C. § 1201 et seq.

## I. PROCEDURAL BACKGROUND

Debtors Anthony Dichiara and Frankie Joe Dichiara filed a voluntary joint petition for relief under chapter 12 of the United States Bankruptcy Code, 11 U.S.C. § 1201 *et seq.*, on 21 April 1995.[1] The debtors filed a proposed plan of reorganization and debt adjustment on 18 July 1995.

Cottonport Bank, a secured creditor of the debtors holding a secured claim in the amount of $452,864.38, objected to confirmation of the proposed plan on the ground that debtors failed to qualify as "family farmers" and thus were not eligible for relief under chapter 12. Specifically, the bank contended that the debtors were not "engaged in a farming operation" pursuant to 11 U.S.C. § 101(18) & (21) and that 50% of the income received by the debtors during the taxable year preceding the filing of their petition was not derived from farming operations as required by 11 U.S.C. § 101(18).

After a hearing on the sole issue of eligibility, the bankruptcy judge overruled Cottonport's objection and held that the debtors qualified for relief under chapter 12. This appeal followed that decision. For the reasons that follow, we affirm the decision of the bankruptcy court.

---

1. The debtors filed a similar chapter 12 petition in 1993 which was dismissed with no plan confirmed.

## II. FACTUAL HISTORY

Debtors Anthony and Frankie Joe Dichiara began farming in 1972. For the next eighteen years, the Dichiaras' principal crop was sugar cane. In 1990, however, Mr. Dichiara began to reduce the size of his sugar cane crop and gradually convert to soybeans.

In 1994, the year preceding the debtors' present chapter 12 petition, the debtors cultivated only 30 acres of sugar cane and received $1,420 in income after the sugar cane was further cultivated and harvested by another farmer pursuant to an informal sharecropping or land rental agreement. In addition, due to difficulty in procuring a crop loan, the debtors only planted a late and modestly sized soybean crop in 1994. Nevertheless, the debtors' gross farm income for 1994, excluding the income received for their share of the sugar cane, totalled $25,287 as reflected by their Schedule F form attached to their 1994 tax return.[2] In 1995, the debtors were able to procure an early crop loan and, as a result, planted their entire 185 acres in soybeans from which they expected to harvest 40–45 bushels per acre and for which they anticipated receiving between $40,000 and $50,000.

In 1991 and 1992, the debtors purchased a 7130 Case International Tractor and a J & L Cane Harvester. The equipment and certain real property secured a loan from Cottonport Bank. In 1994, the debtors, having failed to make any payments on the equipment, sold both the tractor and the harvester and immediately surrendered the proceeds from the sale of the equipment to the bank. The debtors assert that they sold this equipment in an effort to reimburse the bank and because they were getting out of the sugar cane farming business. In their 1994 tax return, debtors reported a total gain from the sale of the equipment (after a combined depreciation allowance of approximately $64,000 for the two machines) of $31,626 ($25,900 for the harvester and $5,726 for the tractor).

In 1993, the debtors began working full time for the State of Louisiana, Department of Corrections. In 1994, the Dichiaras reported combined wage income of $37,320 from their jail jobs. At the confirmation hearing, Mr. Dichiara testified that he had taken his job with the State merely to cover his living expenses and thus reduce the total amount he would have to borrow to finance his farming operation.

## III. STANDARD OF REVIEW

■ This court has the capacity to hear appeals from decisions of a bankruptcy court. *See* 28 U.S.C. § 158. Our review of a bankruptcy court's decision is governed by the same standards of review employed by the Fifth Circuit when reviewing a district court judgment. A bankruptcy court's conclusions of law are subject to plenary review on appeal and the findings of fact are adopted, unless clearly erroneous. "A finding of fact is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' ... 'When a finding of fact is premised on an improper legal standard, or a proper one improperly applied, that finding loses the insulation of the clearly erroneous rule.'" *In re Niland,* 825 F.2d 801, 806 (5th Cir.1987) (quoting *Wilson v. Huffman,* 818 F.2d 1135, 1142 (5th Cir.1987)); *see also Roy v. Gravel,* 143 B.R. 825, 827 (W.D.La.1992), *aff'd* 983 F.2d 1062 (5th Cir.), *cert. denied,* 508 U.S. 961, 113 S.Ct. 2931, 124 L.Ed.2d 681 (1993).

## IV. LAW AND ANALYSIS

The statutory roadmap to debtor eligibility under chapter 12 is relatively straightforward. The Bankruptcy Code's general eligibility section, 11 U.S.C. § 109(f), provides that a "family farmer with regular annual income may be a debtor under chapter 12." The term "family farmer with regular annual income" is defined to mean a "family farmer whose annual income is sufficiently stable and regular to enable such family farmer to make payments under chapter 12 of this title." 11 U.S.C. § 101(19). In contrast to this intentionally flexible and generous definition, the Code defines "family farmer" with

---

**2.** This figure reflects $6,015 in income from the "sale of livestock, produce, grains and other products ... raised"—presumably the soybean crop—and $19,272 in income from agricultural price support payments.

much greater precision. With respect to individuals, 11 U.S.C. § 101(18) defines "family farmer" to mean:

> an individual or individual and spouse *engaged in a farming operation* whose aggregate debts do not exceed $1,500,000 and not less than 80 percent of whose aggregate noncontingent, liquidated debts (excluding a debt for the principal residence of such individual or such individual and spouse unless such debt arises out of a farming operation), on the date the case is filed, arise out of a farming operation owned or operated by such individual or such individual and spouse, *and such individual or such individual and spouse receive from such farming operation more than 50 percent of such individual's or such individual and spouse's gross income for the taxable year preceding the taxable year in which the case concerning such individual or such individual and spouse was filed* (emphasis added).

It is the first and fourth requirements of section 101(18)'s four-part test, that the debtors be "engaged in a farming operation" and that 50 percent of their gross income for 1994 came from a farming operation that form the primary issues in this appeal.

■ The burden of proof rests with the debtors to prove their eligibility for relief under chapter 12. *In re Van Air Flying Service, Inc.,* 146 B.R. 816, 818 (Bankr. E.D.Ark.1992); *see also, In re Tim Wargo & Sons, Inc.,* 869 F.2d 1128, 1130 (8th Cir. 1989).

### A. Engaged in a Farming Operation

■ After conducting its hearing on the issue of eligibility, the bankruptcy court found that the Dichiaras were "engaged in a farming operation" and thus satisfied the first requirement of section 101(18). Cottonport Bank contends that this factual finding is clearly erroneous primarily because the debtors were employed in non-farming occupations in 1994 and because the agricultural activities in which they were engaged did not sufficiently expose them to the inherent risks and cyclical uncertainties inherent in farming.

The core issue under section 101(18) of whether a debtor is engaged in a farming operation actually divides into two separate questions: (1) whether the debtor's operation is of the type that constitutes a "farming operation;" and (2) whether the debtor is "engaged" in the farming operation." *See* Jonathan K. Van Patten, *Chapter 12 in the Courts,* 38 S.D.L.Rev. 52, 63 (1993). With respect to the activities that constitute a "farming operation," 11 U.S.C. § 101(21) states that the term "'farming operation' includes farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an unmanufactured state." Noting the use of the word "includes" rather than the word "means," courts have generally found that the list of activities enumerated in section 101(21) is merely illustrative and not exhaustive. *See* 2 *Collier on Bankruptcy* § 101(21), at 101–81 (1995).

■ Cases in which the question of what constitutes a farming operation has been addressed have usually involved activities lying on the margin between what most people commonly consider to be farming and mere agriculturally related services. *See, e.g., In re Watford,* 898 F.2d 1525, 1527 (11th Cir. 1990) (stone crabbing business not conducted on debtors' property does not constitute farming operation); *In re Maike,* 77 B.R. 832, 839 (Bankr.D.Kan.1987) (game farm and kennel devoted to breeding and raising of pheasants and dogs constituted farming operation); *see also,* Van Patten, 38 S.D.L.Rev. at 63–65. Among the most significant factors courts look for in determining whether a particular activity constitutes a farming operation, however, is whether the debtor is "exposed to the inherent risks and cyclical uncertainties traditionally associated with farming." *In re McNeal,* 848 F.2d 170, 171 (11th Cir.1988)); *see also,* 2 *Collier on Bankruptcy,* § 101(21) at 101–82.

In the present case, the bankruptcy court's finding that the Dichiaras' sugar cane cultivation and soybean farming activities constituted a farming operation is clearly justified. Although the size of their 1994 crops was small in comparison to other years, the debtors nevertheless invested both time and money into cultivating their 30–acre sugar cane crop and their late soybean crop in 1994. Had drought, flooding, freezes, blight or any

of the market vagaries associated with raising crops struck in 1994, the Dichiaras might have failed to reap any reward for either the time or resources they invested in either crop.

The mere fact that the debtors also earned off-farm wage income, while it may have insulated them from the risk of complete destitution, did not shield them from the risk of losing their investment in the crops they had in the ground in 1994.[3] Similarly, the fact that the Dichiara's entered into an informal land rental or sharecropping agreement whereby another farmer further fertilized and harvested the sugar cane crop Mr. Dichiara had initially cultivated and by which the debtors received a percentage of the proceeds from the eventual sale of the cane does not negate the traditional risks the Dichiaras incurred initially with the sugar cane crop and later with their soybean crop. Thus, we find ample evidence to support the bankruptcy court's implicit factual conclusion that the debtors' activities constituted a farming operation.

Turning to the second question which this first issue implicates, we also agree with the bankruptcy court's finding that debtors were "engaged" in the farming operations described previously. In analyzing this particular issue, courts generally adopt a "totality of the circumstances" approach. *See, e.g., In re Fogle,* 87 B.R. 493, 494–95 (Bankr. N.D.Ohio 1988); *In re French,* 139 B.R. 476, 480 (Bankr.D.S.D.1992); *In re Paul,* 83 B.R. 709, 713 (Bankr.D.N.D.1988).

In the present case, the Dichiaras were themselves actively involved in the farming operations occurring in 1994 and continued to be so involved in 1995, the year of filing. With respect to their sugar cane crop, the debtors recultivated the cane by running a disk through the rows to expose the cane stubble, applied a herbicide and a steroid and incurred minor labor expenses. Although they got a late start with their 1994 soybeans, the debtors were solely responsible for planting, cultivating and harvesting that crop. Similarly, the debtors were entirely responsible for their 185 acre 1995 soybean crop. Once again, the facts that the Dichiaras also held non-farm jobs during 1994 and brought in their sugar cane crop with the help of another farmer in a sharecropping or land rental venture do not overshadow their obvious engagement in farming operations. *Cf., In re Tim Wargo & Sons,* 869 F.2d at 1130–31 (corporate debtor does not *conduct* a farming operation if it leases farmland and turns over *all responsibility* for crop production to a tenant farmer and it retains no significant involvement in, or control over, the farming of the acreage); *In re Haschke,* 77 B.R. 223, 225 (Bankr.D.Neb.1987) (debtors who leased out *all* their farmstead except personal residence, sold all their farm equipment and were not involved in any way in farming the leased premises held not to be engaged in a farming operation).

Thus, although we adopt a simpler approach than the one applied by the bankruptcy court,[4] we affirm its basic factual finding

---

**3.** Cottonport Bank fails to cite any case that would support the broad and reorganization-killing proposition that debtors who have full-time non-farm jobs are for this reason disqualified from being considered engaged in a farming operation, except for a fifty year old case under the Bankruptcy Act, *see In re Pollock,* 46 F.Supp. 358, 359 (W.D.La.1942) (full-time lawyer who also operated a number of farms found to be "not primarily engaged in farming"), whose holding cannot be extended beyond its outdated statutory and factual circumstances.

The bank also makes much hay of Mr. Dichiara's testimony that his "primary occupation" prior to 1994 was farming and the fact that he did not make such a statement regarding 1994. The present Code, however, does not require that a debtor be *primarily* engaged in farming operations, only that he be "engaged" in them.

**4.** The bankruptcy court discussed a series of "tests" which it asserted courts have used to

determine whether debtors are actually engaged in farming operations. The discussion of these "various tests" may have been misplaced, however, because the tests have been employed primarily in determinations of whether income from the rental of farm land can be considered "farm income" for purposes of 11 U.S.C. § 101(18), i.e., a question closer in nature to the second major issue in this case. *See, e.g., In re Armstrong,* 812 F.2d 1024, 1027–29 (7th Cir.), *cert. denied,* 484 U.S. 925, 108 S.Ct. 287, 98 L.Ed.2d 248 (1987) ("risk" test); *In re Burke,* 81 B.R. 971, 976 (Bankr.S.D.Iowa) ("totality of the circumstances" test); *In re Easton,* 883 F.2d 630, 636 (8th Cir.1989) ("relationship" test). This confusion is understandable because the "engaged in a farming operation" issue is often intertwined with the "farm income" issue and often implicates the same concepts, particularly that of the inherent risks traditionally associated with farming.

that the debtors in this case were engaged in a farming operation pursuant to 11 U.S.C. § 101(18) & (21).

## B. The Income Test

■ According to their 1994 federal income tax return, which both the debtors and Cottonport Bank agreed accurately represented the debtors' income for that year, the debtors' total gross income for 1994 amounted to $103,607. In order to satisfy the farm income requirement of 11 U.S.C. § 101(18), 50 percent of the Dichiaras' total income, or $51,803.50, must have been derived from farming operations in 1994, the taxable year preceding the debtors' bankruptcy petition.

Reviewing the debtors' income sources, the bankruptcy court classified the following items as farm income: (1) $25,287 in Schedule F farm income (sale of livestock, produce, grains, etc. and agricultural price supports); (2) $31,626 from the sale of farm equipment; and (3) $1,420 in "rental income" from the sugar cane crop. The total, the bankruptcy court concluded, satisfied the income test and thus qualified the debtors as family farmers. Because the combination of the reported Schedule F farm income and the income from the sale of the farm equipment put the debtors over the 50 percent minimum, we will pretermit the question of whether the rental income related to the sugar cane crop was properly considered farm income. Instead, we will now turn our attention to Cottonport Bank's principal contention in this appeal—namely, that the bankruptcy court erred in ruling that the Dichiaras' income from the sale of the two pieces of farm equipment was farm income for purposes of chapter 12 eligibility.

Although Cottonport Bank offers a lengthy and complicated argument on this point, courts have generally held that proceeds from the sale of farm equipment may be classified as farm income. *See* 2 *Collier on Bankruptcy* § 101.18, at 101–75. In the leading case, *In re Armstrong*, 812 F.2d 1024 (7th Cir.), *cert. denied*, 484 U.S. 925, 108 S.Ct. 287, 98 L.Ed.2d 248 (1987), the Seventh Circuit addressed the identical issue in the context of an involuntary bankruptcy petition filed against a debtor who sought to be classified as a "farmer" within the meaning of 11 U.S.C. §§ 303 and the identical predecessors

to present sections 101(20) & (21). In that case, the court held that proceeds from the sale of farm equipment should be classified as received from farming operations. *Id.* at 1026. Explaining this holding, the court noted two important factors that shaped its reasoning: (1) that the debtor's farm machinery was "inescapably interwoven with his farming operation;" and (2) that the debtor was "never in the business of buying, selling or trading such machinery." *Id.* Furthermore, in language that speaks directly to the facts of this case, the court also observed:

> When a farmer sells some of his machinery in an effort to scale down his operation (say from 200–100 acres) and save the farm, the money received is inescapably from the 50% of the farming operation dissolved. *Id.*

In essence, the court believed that Congress did not intend for farmers to be placed outside the farmer definition of the Code merely because they had pruned their operation in order to keep a failed enterprise afloat. *Id.* at 1027.

Numerous bankruptcy courts have adhered to the general principles outlined in *Armstrong* and have similarly held in the context of chapter 12 eligibility disputes that proceeds from the sale of farm equipment should be classified as farm income for purposes of the section 101(18) income test. *See In re Burke*, 81 B.R. 971, 977 (Bankr. S.D.Iowa 1987) (income from sale of farm machinery will be farm income "unless the debtors buy, sell or trade machinery in a business fashion *or* unless the sale entails all the machinery and the debtors do not intend to lease or to borrow machinery from another available source"); *In re Shepherd*, 75 B.R. 501, 505 (Bankr.N.D.Ohio 1987) (proceeds from sale of all of debtors' farm machinery properly considered farm income); *In re Haschke*, 77 B.R. 223, 225 (Bankr. D.Neb.1987) (proceeds from sale of all of debtors' farm equipment considered farm income even though debtors were no longer engaged in farming); *In re Rott*, 73 B.R. 366, 372–73 (Bankr.D.N.D.1987); *In re Barnett*, 162 B.R. 535, 537 (Bankr.W.D.Mo.1993).

In the present case, the facts suggest that the bankruptcy court properly classified the

proceeds from the sale of the debtors' cane harvester and tractor as farm income. First, there is no suggestion in the record that the debtors were engaged in the business of buying, selling or trading farm machinery. More importantly, it appears that the two pieces of equipment sold were interwoven with the debtors' farming operation. The machines were purchased for the purpose of aiding the debtors' farming operation and, just as in *Armstrong*, were sold when the debtors attempted to scale down their operation and save the farm—in this case by concentrating their efforts on soybeans. Finally, unlike debtors who have essentially liquidated all of their farm assets, the debtors here have retained ample other machinery, as evidenced by their "Depreciation Detail Listing" attached to their 1994 tax return, or have access to other equipment with which they intend to continue their soybean farming.

Cottonport Bank's principal objection to the bankruptcy court's ruling on this issue once again centers on the facts that in 1994 the debtor had obtained full time non-farm employment and had entered into the informal sharecropping agreement whereby another farmer completed the cultivation and harvesting of the sugar cane crop that he had initially cultivated that year. In support of its contentions, Cottonport Bank quotes a passage in *Armstrong* in which the court opined that it would have been illogical for Congress to have intended that:

> Farmers in financial trouble could harvest their crop on a given year, decide to scale down their operation, sell machinery and be considered nonfarmers under Section 101(17) *even though they had no significant outside employment or income. In re Armstrong*, 812 F.2d at 1026–27 (emphasis added).

■ While we agree with the Seventh Circuit that a debtor's *lack* of any outside income might reasonably be another factor weighing in favor of classifying proceeds from the sale of farm equipment as farm income, we do not read this hypothetical dicta as suggesting that the mere presence of any "significant outside employment" should operate as a bar to classifying any other source of income as income received from farming operations. Indeed, we have neither been cited to nor found any authority that would support the adoption of such an eligibility limiting rule.

Finally, just like the bankruptcy court's discussion of the "engaged in a farming operation" issue, Cottonport Bank's extensive discussion of the "various tests" that courts have employed in attempting to characterize debtors' income is well intentioned but misplaced because those tests were invariably employed for the particular purpose of determining whether income from the *rental* of farm *land* (as opposed to the sale of farm equipment) can be considered farm income. *See In re Armstrong*, 812 F.2d 1024, 1027–29 (7th Cir.), *cert. denied*, 484 U.S. 925, 108 S.Ct. 287, 98 L.Ed.2d 248 (1987) ("risk" test applied to rental income classification); *In re Burke*, 81 B.R. 971, 976–77 (Bankr.S.D.Iowa 1987) ("totality of the circumstances" test applied to same); *In re Easton*, 883 F.2d 630, 633–36 (8th Cir.1989) ("relationship" test requiring debtor to have some significant degree of engagement, operational role, or ownership interest in the farming operation applied to cash rent classification); *In re Creviston*, 157 B.R. 380, 384–85 (Bankr. S.D.Ohio 1993) (multi-factored "logical relationship" test applied to rental income issue).

While the rental income classification issue appears analogous to the one we face here, it necessarily raises more complicated analytical questions—for instance about the degree of risk borne by the farmer/lessor of crop land and about the degree of the farmer/lessor's actual involvement in the activities of farming—that a discreet, one time sale of farm equipment simply does not present. Thus, we will decline to choose among the alternative tests Cottonport Bank has surveyed for us and remain satisfied that the simple inquiry articulated in *Armstrong* provides a proper framework for resolving the precise classification issue before us. With this said, we find that the bankruptcy court properly classified the debtors' income from the sale of their farm equipment as received from their farming operation and thus affirm its holding that the debtors satisfied the income test of section 101(18).

### C. Four Corners of the Debtor's Tax Return

The final contention raised by Cottonport Bank's appeal is that the bankruptcy court erred in allegedly not restricting its evidentiary findings solely to the four-corners of the debtors' 1994 tax return in analyzing the debtor's income under the section 101(18) farm income test. In support of this contention, debtors cite three brief cases.

In *In re Bergmann*, 78 B.R. 911, 912 (Bankr.S.D.Ill.1987), the bankruptcy court noted merely that it could not consider income from any year other than the year preceding the filing of the debtors' chapter 12 petition and in that sense "did not have the power to look beyond the face of the debtors' 1986 income tax return." In a conversion case and an involuntary petition case, two courts also ruled that they could consider neither income derived from events that occurred in years other than the year preceding the filing of the petition nor circumstances of years other than the year preceding the petition. *See In re Nelson*, 73 B.R. 363, 365 (Bankr.D.Kan.1987) (income from damage settlement for fire that occurred four years prior to petition and was not shown on debtors' tax return for year preceding the petition could not be considered for purposes of the income test); *Potmesil v. Alexandria Production Credit Ass'n*, 42 B.R. 731, 732 (W.D.La.1984) (dismissing creditor's argument that bankruptcy court should have considered fact that debtors, who clearly met income test for year preceding the filing, were no longer farmers at time involuntary petition was filed).

While we agree with the specific rulings in each of these cases, we believe they merely stand for the limited proposition that the bankruptcy court may only apply its analysis of the income test required by section 101(18) to items of income derived and reported during the taxable year preceding the filing of the bankruptcy petition. In the instant matter, this is exactly what the bankruptcy court did.

 Tellingly, Cottonport's final argument in this section of its appeal asserts that the only income sources the bankruptcy court should have examined were those reported on the debtor's Schedule F form. At last, then, the bank appears to be using its technical "four corners of the tax return" argument as a pretext for one more attempt to induce us to bar the bankruptcy court from considering the debtors' income from the sale of the farm equipment reported on their 4797 form. Once again, we reject this invitation. If Congress had intended to restrict a court's analysis of the income test to a single tax return schedule, such as Schedule F, it would have done so explicitly. In short, we find no error on the bankruptcy court's part with respect to this final contention offered by Cottonport Bank.

In conclusion, this court AFFIRMS the judgment of the bankruptcy court in all three issues in this appeal and thus AFFIRMS the bankruptcy court's finding that the debtors qualify for relief under chapter 12.